**Opinion issued February 4, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00016-CV

————————————

**MARCA E. MAULDIN, Appellant**

**V.**

**JERRY CLEMENTS AND JANET CLEMENTS, Appellees**

---

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Case No. 0865151**

---

## O P I N I O N

In this post-divorce modification suit affecting the parent-child relationship, appellant, Marca Mauldin, appeals the trial court's final order awarding the paternal grandparents, appellees Jerry and Janet Clements, sole managing conservatorship of her two children, C.T.M. and H.T.M. In five issues, Marca

argues that: (1) the trial court abused its discretion in awarding Janet and Jerry temporary possession of or access to the children before they had any pleadings on file; (2) Janet and Jerry lacked standing to intervene in the suit; (3) the evidence was insufficient to support the trial court's appointment of Janet and Jerry as the children's sole managing conservators; (4) the evidence was legally and factually insufficient to rebut the presumption that appointing a parent as the children's managing conservator was in their best interest; (5) the trial court abused its discretion in ordering that Marca's possession of and access to her children must be supervised; and (6) the trial court erred when it failed to issue written findings of fact and conclusions of law.

We affirm.

### Background

Marca and Mark Mauldin were divorced in Burnet County on May 26, 2004. At the time of the divorce, C.T.M. was seven years old and H.T.M. was one-and-a-half years old. Marca and Mark were appointed joint managing conservators. Marca was awarded the right to determine the children's primary residence, and Mark was ordered to pay Marca child support in the amount of $600 per month.

In January 2006, Mark filed a post-divorce petition for modification in a suit affecting the parent-child relationship in Burnet County. Mark asked the court to appoint him the children's sole managing conservator and asked the court "to

2

determine whether there is a risk of international abduction of the children by [Marca] and to take such measures as are necessary to protect the children." Mark further alleged that Marca "has a history or pattern of child neglect and abuse directed against" C.T.M. and H.T.M. and requested that the court deny Marca access to the children, or alternatively, that the court order that Marca's periods of visitation be supervised. Mark subsequently moved to enforce his rights to possession of and access to the children, alleging that Marca had denied him access to the children on three occasions.

Marca filed a counter-petition for modification on May 23, 2006. Marca asked to be named the children's sole managing conservator and requested that the trial court deny Mark access to the children or, alternatively, that the court limit his visitation and order him "to refrain from the consumption of alcohol or a controlled substance" and "to attend and complete a battering intervention and prevention program." Marca alleged that Mark "has a history or pattern of child neglect and physical abuse directed against the children the subject of this suit" and that Mark "has denied [Marca] possession of or access to the children the subject of this suit on two or more occasions."

On August 25, 2006, the Burnet County court issued temporary orders, ordering that Marca and Mark both have possession of the children as previously agreed in the divorce decree or, in the absence of an agreement, pursuant to a

Standard Possession Order. The Burnet County court extended its earlier order requiring that C.T.M. continue psychiatric treatment and that Marca and Mark agree to follow the required psychiatric care and medication prescribed by C.T.M.'s psychiatrist. The Burnet County court ordered that the parties appoint a psychologist to prepare a psychological evaluation to address, for purposes of future custody arrangements, "whether either parent poses a danger to the children's psychological or physical well-being or has attempted to alienate the other parent from the children, which parent should have primary custody of the children, and whether either party shall have supervised visitation or shall be denied visitation" with H.T.M. and C.T.M. Finally, the Burnet County court found that "the parent conservators sharing or having independent rights to make medical decisions for the children is not in the children's best interests" and ordered that Marca have "the exclusive right to make medical decisions for the children the subject of this suit, except for psychiatric treatment of [C.T.M.] as referenced in this order above."

Marca relocated to Harris County, where she moved for a protective order. On November 8, 2006, the Harris County court entered a protective order against Mark. The court found that Mark had committed family violence and ordered that Mark was prohibited from communicating with Marca and the children "in a threatening or harassing manner," either directly or indirectly, from going near

4

Marca's residence or place of employment, from possessing a firearm, and from following Marca and the children or engaging in any behavior "that is likely to harass, annoy, alarm, abuse, torment, or embarrass" them. However, the court also wrote in the protective order that it "found issues of credibility with some aspects of [Marca's] testimony and affidavit" and that it was "not able to determine whether there is a history or pattern of family violence and issues no finding in that regard." The Harris County court further ordered that all orders entered by the Burnet County court remained in effect, and it allowed Mark continued visitation with the children.

The case was subsequently transferred to Harris County, where Marca moved for modification of the temporary orders entered by the Burnet County court. Marca alleged that Mark "has pending criminal charges for the possession of a controlled substance"; "has forced [C.T.M. and H.T.M.] to drink alcohol"; "has watched pornography in front of one of the children"; and has "committed family violence." Marca requested that Mark be denied access to the children or that his periods of visitation be continuously supervised. The parties entered a Rule 11 agreement providing that Mark "shall not exercise visitation with the children . . . until this matter is heard by Judge Rynd which is set for temporary orders on Feb. 10, 2009 at 9:00 am."

On February 10, 2009, the trial court ordered a change to the visitation schedule. It also ordered that the parties submit to drug tests, that they not move without written court order, and that the children remain at their current school while the case was pending. On November 23, 2009, Marca moved for enforcement of Mark's child support obligations.

On June 24, 2010, Patricia Bushman, the amicus attorney appointed on behalf of C.T.M. and H.T.M., moved to modify the temporary orders. Bushman alleged that "both Mark Mauldin and Marca Mauldin have caused the children to be in situations which cause them to sustain mental and emotional injuries, resulting in observable and material impairment in their growth, development and psychological functioning." Bushman requested that "the support and possession and access orders be modified in a manner that is best for the children," that "the parties submit to a psychological evaluation," and that "both children be immediately enrolled in counseling with a counselor chosen by the Court." In a supporting affidavit, Marca stated that the Department of Family and Protective Services ("DFPS") was conducting an investigation into the welfare of the children.

On July 14, 2010, the trial court held a hearing on Bushman's motion. Bushman stated:

> I believe [the boys] are still being continually coached and talked to about these issues [by Marca] and it's damaging to the children. I think it has risen to the level of abuse.
>
> The younger one is being pressured into making allegations against his father that I don't think the younger one thinks they're true. He's just being pressured into doing it. . . .
>
> The older one is making claims out of the blue. It's almost as if he's making them up. The older one calls his father a queer and a fag all the time. If you ask him why, it's because his mom said that he's a queer and a fag because he likes boys. The older one can describe his dad using cocaine although he's never seen it. If you ask him why, it's because his mother has told him how it works.
>
> We talked to her at the temporary orders a year ago about doing this and she said she'd stop, but she hasn't. It's continuing. . . .

Also, Bushman argued that one of the conditions of leaving the children in Marca's custody in the last temporary orders was that the boys attend counseling and that Marca had not been taking the boys to counseling.

Janet Clements, Mark's mother,[1] testified at this hearing in support of Bushman's arguments to the trial court. She testified that up until Bushman filed the motion for temporary orders two weeks previously, the boys had spent the night at her house between one and four nights a week and that even on days when they did not spend the night they visited her house every weekday until approximately eight o'clock at night. Janet testified that she had witnessed Marca criticizing Mark to the boys, telling them that Mark is "a bad person" or that he is "a queer" who "likes little boys." Janet also observed Marca tell the boys about incidents in which Mark had allegedly done drugs. Janet testified that she had

---

[1] Janet's husband, Jerry Clements, is Mark's step-father.

7

spoken to Marca about these comments, but it did not stop Marca from making them. When asked if she had concerns about the boys staying in Marca's custody, Janet replied: "I have concerns that they're going to continue to learn to lie. They're just better boys when they're away from her. I mean, she's teaching them to lie. She manipulates them. They have no routine." Janet also testified that they boys were not attending counseling at that time even though she had spoken to Marca about it "repeatedly" and had offered to pay for the counseling. Marca told her that "they didn't need counseling anymore."

Janet testified that after she began cooperating with Bushman Marca started treating her differently. Janet had not seen the boys in three weeks, and Marca made a report to DFPS that Janet had hit the boys. On cross examination, Janet testified that she "hit [H.T.M.] one time" on the arm, but she did not cause any injury to either child. She testified that she had asked H.T.M. to pick up some books, he instead threw them at her, and she "just popped him like that on the arm," but she did not leave a mark. Janet testified that Marca had also hit her children. She gave the example that "a couple of months ago . . . [H.T.M.] said something to her and she popped him." Janet stated that Marca had called DFPS and made reports against her and against Mark "several times" and "it's all been unfounded as far as I'm aware of."

Marca testified that, as part of the investigation into the indecency-with-a-child allegations against Mark, the DFPS caseworker questioned the boys and one of them reported that Janet had hit him. Marca also produced a photograph of H.T.M.'s bottom, allegedly taken twenty-four hours after Janet had spanked him, showing a handprint and bruising. Marca testified that she discussed the spanking with Janet, who acknowledged to her that she had spanked H.T.M. and told her "he didn't get anything he didn't deserve." Marca also testified that she made a report to DFPS that Janet gave C.T.M. Lexapro that was not prescribed to him. Marca acknowledged that the boys had not been in counseling since December 2009 because the counselor told her C.T.M. was doing better and "said it was okay" to stop the counseling, and she was waiting for their last counselor to recommend someone new for the boys to see. Marca also denied making any comments to the boys about their father being "queer" or about his alcohol or drug consumption.

The trial court then recessed the hearing to allow DFPS to provide information regarding its involvement in the case. The trial court stated that it wanted "to get a status of the investigation" before it proceeded any further. The trial court subsequently granted Janet and Jerry visitation with the children after school each day.

According to the parties, on October 22, 2010, Janet and Jerry filed their petition in intervention, requesting to be appointed joint managing conservators of

9

C.T.M. and H.T.M. However, the petition in intervention does not appear in the appellate record.

On January 7, 2011, the trial court held another hearing. Mark's attorney informed the trial court that there were currently "two indecency with children claims that the mother has made against him" and one positive drug test for marijuana. Mark was not seeking custody of the children, but he understood that Janet and Jerry had intervened and were seeking custody of C.T.M. and H.T.M. A DFPS caseworker stated that, as far as DFPS was concerned, "the allegations [against Mark] that were investigated of sexual indecency, those were ruled out." The DFPS caseworker also informed the court of the progress in completing psychological evaluations.

The DFPS caseworker also informed the court that the boys wanted to reduce their visitation with Janet and Jerry. She stated that when the trial court originally ordered that Janet and Jerry have custody of the boys every day after school, they all lived fairly close to each other, but Janet and Jerry had since moved to Richmond. Janet and Jerry's attorney argued that Marca "does everything she can to make [the current custody arrangement] difficult and make it hard for the boys" by scheduling activities and appointments in a way that made it difficult for Janet and Jerry to exercise their visitation pursuant to the court's previous order. The trial court admonished the parties on the record that they

needed to leave the children out of the disputes between the adults and not communicate with the children about the on-going litigation.

On January 14, 2011, the trial court entered an order listing that Mark, Marca, and Bushman all appeared in person and that "Intervenors, Janet and Jerry Clements, appeared in person and through attorney of record." The trial court ordered that Janet and Jerry have possession of the children on the second and fourth weekend of each month and that Marca have the right of possession of the children at all other times. It further ordered that Mark have supervised visitation two times a month "when and/or if the no contact order regarding [Mark] is lifted." The court further ordered DFPS to provide family-based safety services, including complete psychological assessments on Mark, Marca, the children, and Janet and Jerry.

At a March 23, 2011 status conference, the trial court began the hearing by swearing in anyone "who [is] going to testify, if necessary." The amicus attorney, Bushman, then informed the court that DFPS had completed all of its ordered tasks except for the psychological evaluations of Janet and Jerry. Bushman also reported the results of her investigation into the children's medical and school records. She stated that Marca had been uncooperative but that Janet had provided the necessary information regarding doctors to contact. Bushman also stated that her "meetings with the schools were eye opening," as the school personnel reported that, as of

11

January 2011, C.T.M. had had six in-school suspensions, two out-of-school suspensions, and over 116 absences from various classes. Marca supplied his current progress report, which indicated that he currently had two As, two Fs, a C, and a D. The school personnel reported to Bushman that C.T.M. "acts out in class to get what he wants" and "there doesn't seem to be any way to discipline him or hold him accountable." The school reported the C.T.M. did not attend his mandatory tutoring sessions.

School personnel at H.T.M.'s school also reported behavioral problems leading to lunch detentions and other disciplinary problems, stating, "The record shows he just lays on the floor and just refuses to do anything." Bushman further stated that H.T.M's behavior "is escalating," that his latest progress report showed unsatisfactory conduct marks in the majority of his classes, and that his grades were suffering.

Bushman stated that DFPS had terminated the funding for the children's counseling due to budget cuts. She stated that, in spite of Marca's representation to DFPS that their therapist would accept the children's Medicaid, it appeared that the children had not been attending the court-ordered counseling. She also stated that Marca was continuing to involve the children in the litigation unnecessarily and "puts them in the middle of it," explaining that, when she went to H.T.M's

school, "the teachers commented that [H.T.M] had been very upset all day because he knew we were coming to the school and he knew that from his mother."

Bushman recommended to the trial court that "these boys need to be away from their mother. They need to have 30 days where they don't see her and then they need to only see her through a therapeutic setting until this can be straightened out." Bushman visited a school in Huntsville that she believed would have been a good placement, but DFPS did not have the funds to pay for that placement and the school did not take insurance. Bushman testified that she was comfortable with the boys going to Janet and Jerry, "but if there's somewhere else that's reasonable, I'm not opposed to it." She believed the boys' removal from Marca's custody needed to happen that afternoon.

The DFPS caseworker supported Bushman's recommendation that the children be removed from Marca's custody, citing "the emotional trauma that these guys have gone through based on the 17 allegations and referrals [DFPS] has had to investigate over the past few years with this family." However, DFPS did not support sending the boys to Janet and Jerry "until after we've got the psychological." DFPS cited allegations of abuse that Mark had made against Janet in his own psychological evaluation as the reason they wanted more information on Janet and Jerry. The caseworker acknowledged that the boys needed more structured living arrangements than Marca had provided.

13

Bushman informed the trial court that she did not believe anyone involved in the case could pay for residential treatment. She stated that she did a home visit at Janet and Jerry's home with the boys present. She testified that she was aware that Janet and Jerry had cared for the children "for quite a while several years ago" and that during that time, the boys did well. Bushman stated that the records indicated that they attended school regularly and were on time and that Janet took them to their doctor's appointments. Bushman concluded that, although she thought residential treatment might be the best option for C.T.M., she believed "under the circumstances and with the finances," that placing both boys with Janet and Jerry was "probably the most reasonable thing."

The trial court questioned Marca about the problems with the boys' school attendance and their behavior problems. Marca recounted numerous problems relating to previous disputes with Mark, Janet, and Jerry, and the trial court informed her that it did not find those previous incidents relevant to the present situation. However, regarding the situation at the time of the hearing, Marca stated that she believed the boys were doing better, especially since the trial court modified the custody arrangements in January to eliminate the visitation with Janet and Jerry after school. Regarding the counseling, Marca testified that DFPS cancelled their in-home services and that she had been making appointments and

14

contacting people to set up more counseling, but they had not been in counseling since then.

Janet and Jerry's attorney informed the court that they had been in contact with DFPS to complete the psychological evaluation and had an evaluation scheduled. She also told the court that Janet and Jerry denied all of the allegations of abuse made by Mark and would testify under oath. She also argued that Janet and Jerry would be a good placement because Jerry is a police officer and the couple had been "the only stable force in these kids' lives for years." Mark's attorney informed the court that Mark had no objection to Janet and Jerry obtaining custody of the children, but Mark would not testify at the hearing because of the criminal charges that were pending against him at that time. Mark's attorney also informed the court that he believed the charges against Mark would be dismissed, but the hearing had been postponed until the following week.

Jerry told the court that he and Janet were available to the children and wanted the opportunity to provide them with a more stable environment. He testified that both boys had rooms already set up at Janet and Jerry's home. The trial court asked him what kind of discipline techniques he used with the boys, and Jerry responded that, for the most part, the boys did what he told them to do as long as he followed through in checking up on them. He testified that on occasions

when they did not follow through, removing their access to their electronic devices was effective.

At the end of the status conference, the trial court stated that "on its own motion" it was placing the children in Janet and Jerry's custody that day. The trial court entered new orders ordering that Janet and Jerry "take immediate physical possession of the children by removing them from school at the time school dismisses"; that Marca assist in enrolling the children in new schools "relevant to the grandparent's home" as specified in the order; that Janet and Jerry retain physical possession of the children until further order of the court; that Janet and Jerry were appointed as the temporary sole managing conservators of the children and the parents were appointed as temporary possessory conservators; that neither parent was to "have any contact with the children"; and that both Marca and Mark were required to pay child support to Janet and Jerry.

Two days later, on March 25, 2011, the trial court reconvened for a hearing on the entry of the order. Bushman informed the court that the children were upset when she told them that they would be living with Janet and Jerry for the present time rather than with their mother, but they appeared to be doing well. She also informed the court that, upon meeting with the children following the March 23 hearing, H.T.M. asked her about what happened in court that morning because his mom had told him about the hearing, contradicting Marca's earlier testimony that

16

she did not tell them about the status conference. Janet and Jerry's attorney also informed the court that Marca had concealed notes to the boys inside their stuffed animals in spite of promising the court that she would not violate the court's order not to contact the children. Janet and Jerry introduced the notes as evidence, and they were included in the record. In the notes, Marca told the boys that she loved them and encouraged them to "do all that you can so you can come home."

The trial court entered further temporary orders on June 10, 2011. The trial court ordered that C.T.M. and H.T.M. continue their counseling and that Mark and Marca both seek individual counseling with a different psychologist. The court ordered Marca and Mark to sign a release allowing their counselors to communicate with each other and with the children's psychologist. Finally, the court ordered that the children's psychologist make recommendations to the court and to the attorneys of record regarding periods of possession appropriate for each parent.

The parties appeared for trial on August 23 and 24, 2011. Marca testified about the children's various behavioral problems at school during the time they had been in her custody and her attempts to discipline them and provide them with the help they needed. Specifically, Marca testified that H.T.M., who was nine years old at the time of trial, was tardy to school ten times the first semester of his second grade year, while he was living with her, for "[v]arious reasons," including

17

"illness, going to the bathroom, [and] just not getting to school on time." She stated that they were late because she "was just under extreme stress at this time." She also testified that H.T.M. was sometimes tardy because of his own behavior, not just because she was late.

Marca also admitted that C.T.M.'s school records during the time he was in her custody contained reports that he used violent, threatening language, was defiant and disruptive, teased people, and exhibited a lack of respect for others. Once C.T.M. began sixth grade, he was suspended for fighting on two occasions. Marca testified that she discussed his behavior with the school principal at that time and that she disciplined C.T.M. at home as well. She testified that, when he was living with her, C.T.M. was "being bullied and kicked in the back and bruised in the kidney area. I took [C.T.M.] to the doctor, but regardless, because he fought back, he got in trouble." She also stated that "it was [C.T.M.'s] fault because he didn't control his actions. He fought back. I don't agree with doing that. He should have went and got the teachers." C.T.M. also had numerous unexcused absences and tardies. He continued to have severe behavioral problems and academic performance issues in the seventh grade, while he was still living with her.

Marca testified that she disciplined the boys at home and eventually sought counseling and psychiatric help for them. She also had numerous meetings with

18

teachers, administrators, and other school personnel regarding the boys' behavior and performance during the time when she had custody of them.

Marca testified that she thought she had done everything she could to help her boys be successful at school while they were in her custody and that she has "even learned more skills." She acknowledged that she "could have [been] more consistent with the tutor." Marca testified that C.T.M. was supposed to attend tutoring after school on certain days, so she informed Janet, who at this time was picking the boys up after school, that he should be picked up later. On one occasion C.T.M. left school and came home, to Marca's house, instead of staying for tutoring. Janet and Jerry's attorney also asked about occasions on which C.T.M. "would show up earlier than Janet would expect because he had not gone to tutoring." Marca stated that Janet "did not discuss that with [her]."

Marca also acknowledged that she sent notes to her children after they had been placed in Janet and Jerry's custody in violation of the trial court's order that she not contact her children at all except through a mental health professional. Marca also testified regarding incidents in which Bushman and the DFPS caseworker had observed her discussing the case with the boys in violation of the court's order. Marca denied discussing the case with the boys, stating that she was misheard and her comments were misinterpreted. Bushman also questioned Marca extensively regarding inconsistencies in the circumstances surrounding C.T.M.'s

19

allegations of indecent exposure and drug use against Mark. C.T.M. reported that Mark had exposed himself to the boys and that Mark had used cocaine, but these claims were determined to be unfounded. Marca testified that C.T.M. told her he saw his father doing these things and if the district attorney or any other investigator stated otherwise, she did not know why. Marca also testified that she stopped C.T.M.'s therapy when the therapist stated that he needed a break, but she did not return him to therapy, nor did she contact the trial court in spite of the fact that the court had ordered that C.T.M. receive counseling. She also agreed that she unilaterally decided to refuse Mark visitation with the boys because she "didn't want them to be in danger."

Ashley Hill, Mark's niece, testified at trial that she occasionally babysat the boys while they were living with Marca. She testified that while the boys were with Marca, they were "very disrespectful" and that they "never seemed to be happy to me or in a good—stable with school and they just weren't kids." She stated that the boys "didn't know how to act. They didn't know how to play. They didn't know how to have fun." She stated that she had opportunities to witness how the boys interacted with Marca and that they would treat her disrespectfully and call her names. Marca would respond by "roll[ing] her eyes and turn[ing] her head," and she did not believe that Marca disciplined them for it. She testified that Marca would also frequently be a few hours late to pick up the boys. Ashley was

20

concerned about them and discussed the situation with Janet. Ashley testified that since the boys had begun living with Janet and Jerry, "[t]hey seem a whole lot happier. . . . They're very respectful." They helped with work around the house, they complained less, and they played well with other children. She testified that she believed it was "better for the kids to stay where they are."

Gayle Coulam, Janet's sister, testified that in the year before the boys began living with Janet and Jerry, C.T.M. "was always like he was ready to attack" and "had anger" and was "very standoffish," while H.T.M. "was more of a little kid that was damaged and afraid." Coulam testified that C.T.M. "was more like a parent, [and] disciplined [H.T.M.]" by "bark[ing] orders at him, telling him what to do and not to do that and stop it and shut up." She testified that she observed Marca around the boys and she "never saw a happy relationship. It was just more or less they were right there by her, you know, the last time I saw them together." She testified that the boys used to lie and she was very concerned about them. Coulam testified that since the boys had begun living with Janet and Jerry, they had "completely changed." She stated, "[C.T.M.] is very mature. He has manners. He's quit barking orders at [H.T.M.]. He's got a peace about him. And he's more calm. He's a child. He's a 13-year-old and he acts like a child now." She also stated, "[H.T.M.'s] pleasant to be around, too. He's more quiet. He's very mature, too, for his age, I noticed, and he gets along very well with my grandkids."

21

Dr. Brad Michael, a licensed clinical psychologist, testified that he began treating C.T.M. and H.T.M. around the time that they transitioned from living with Marca to living with Janet and Jerry. He testified that the boys "indicated they were told that if their behavior improved they would be able to go back to live with their mother." He observed Marca's interactions with the boys, and it seemed mostly appropriate and "casual." They did not discuss the problems arising from the pending litigation. Dr. Michael testified that both Marca and the boys expressed to him their belief that nothing that had occurred in their home warranted the boys' removal from Marca's custody. However, Marca did not discuss with him any plans she had to improve the situations that led to her losing custody of C.T.M. and H.T.M. Dr. Michael testified that he believed that was something that should have been addressed in individual therapy for Marca. He further testified that "Marca indicated that she'd been to parenting workshops and parenting courses and done well in all of those. My sense was, though, that that did not lead to particularly more effective parenting on her part in the home."

He testified that he believed visitation between Marca and the boys should "start off gradually and then be increased to some degree" and that, while he did not believe the visits needed to be supervised, he "would want to talk with the boys and their mom before and then the boys after the visits as well to be sure that those are appropriate and . . . that there weren't any problems during those times." Dr.

22

Michael made this recommendation based on the understanding that Marca would meet certain requirements of the court, such as seeking individual therapy and agreeing to refrain from making disparaging remarks about other people involved in the case. Dr. Michael further stated that the boys seemed ambivalent about their future living arrangements—at times they expressed a desire to live with their mother while at other times they indicated that they would like to stay with Janet and Jerry.

Detective R. Womble, a detective with the Fort Bend County Sheriff's Office ("FBCSO") in the special crimes unit, testified that he conducted the FBCSO's investigation into a report Marca filed in August 2010 asserting that Janet had assaulted C.T.M. and had provided him with Lexapro—an antidepressant not prescribed to him—in May 2010. Womble stated that the deputy who took the original report made a referral to DFPS, in accordance with the FBCSO's standard procedure for complaints involving children. DFPS investigated the case and closed it without taking any action, so Detective Womble likewise closed his investigation. Then, approximately eleven months after the reported incident, Marca contacted him to say that the original report had incorrectly stated that Janet assaulted C.T.M. and that Janet had actually assaulted H.T.M. This seemed unusual to Detective Womble because "it was just kind of out of the blue."

23

Deputy R. Colunga, another employee of the FBCSO, testified that she was also involved in the investigation into Marca's assault allegations against Janet. Colunga testified that she investigated Marca's allegation that the original report provided that C.T.M., and not H.T.M., was the victim of the assault. Colunga discovered that Marca had original stated that H.T.M. was the victim and the original report was incorrect. She testified that she found it odd that Marca waited three months to make the original report, and she was also "concerned . . . that it took a whole year for her to recognize that the children had been mixed up in the report."

Marca also testified regarding the assault report. She stated that "the spanking" was first reported to DFPS in June 2010 during "in the interview about the sexual crime"—presumably Mark's alleged indecent exposure—when "[t]he lady brought me back in and said the kids stated they'd been slapped and hit by the grandma, Janet. And so, I had a picture of the spanking [showing a handprint on H.T.M.'s bottom] and showed her." She testified that she let the kids go to Florida on a vacation with Janet and Jerry after this incident because she "felt like Janet could control herself a little better when Jerry was around." The trial court ordered that the children have regular visitation with Janet and Jerry in mid-July 2010, and Marca made the complaint about the alleged assault in August 2010 because she "was told that's the procedure [she] was supposed to have taken." She testified

24

that she did not make the report when she first discovered the mark because "in the previous history of our last 17 years, the reports made in their county never get followed through with. So I didn't make the report with that police department." She testified that she acted on the advice of her attorney in making the report in August.[2]

Marca testified that she was not aware that DFPS had found her charge to be unfounded and had closed the case against Janet and Jerry. The amicus attorney asked, "Do you have any concern at all that your kids have made a number of allegations that have been found to be unfounded or dismissed?" Marca responded, "It creates a huge concern that people continue to call my children liars when they know they did the action. It's a huge concern."

Janet also testified. She addressed Marca's allegations that she gave C.T.M. Lexapro during the July 2010 vacation. In April 2010, Janet told Marca that she was concerned about C.T.M. because he seemed increasingly depressed and withdrawn, and she believed Marca "needed to get him on something because [she] was really worried about him." In response, Marca told her that "[s]he had some Lexapro that she could put him on until she could talk to—until the insurance went into effect." Janet believed that Marca obtained the Lexapro as a sample from her

---

[2]   Jerry Clements is a major in the FBCSO, and both Detective Womble and Deputy Colunga testified that they did not work with him directly and that he did not attempt to influence them in any way.

doctor. She testified that Marca gave her a bottle with two medications in it to give to C.T.M. One, Desmopressin, was prescribed to C.T.M., and the other was Lexapro. Janet testified that she gave C.T.M. the medications provided by Marca because she felt obligated to follow Marca's instructions. She further stated that she currently gives C.T.M. only medication that has been prescribed to him.

Janet testified that, in the six months prior to the March 23, 2011 status conference, while the boys were still living with Marca and staying with her after school or on weekends, the boys were "angry" and "sad." She testified that H.T.M. "was being beaten constantly by [C.T.M.]" and seemed "scared" of both C.T.M. and his mother. One day, he said to her, "'Mom and [C.T.M.] tells me to tell lies on you and Big Daddy and make me tell the policeman lies on you and Big Daddy, but [C.T.M.] will beat me up. Please don't tell him." She stated that she frequently observed bruises on his arms and legs. Janet testified that Marca would refer to C.T.M. as the "man of the house" and that C.T.M. controlled H.T.M.'s "every move." She testified that she was also very concerned about their performance at school. Janet had helped them with their homework in the past, but she did not do it for them. However, leading up to March 23, 2011 status conference, Marca refused to let her look in the boys' backpacks or to have any involvement with their homework.

Janet testified that, after the trial court awarded her and Jerry custody on March 23, 2011, they went to pick the boys up at school as ordered by the trial court. C.T.M. was angry and "lost it," blaming the amicus attorney, Bushman, and he said, "Momma said that this was going to happen." As ordered, Janet and Jerry took the boys to Bushman, who explained the trial court's ruling to them. Janet was not in the room for that discussion, but she did not believe that Bushman told the boys that the change in custody was Marca's fault. After the meeting, the kids were "[t]otally different" and had calmed down. They were all "pretty stressed," but the boys prepared themselves for going to a new school the next day and "were both happy, as happy as they could be." Janet testified that, at the time of trial, the boys were "awesome":

> They have personality now. They're happy. They're stable. They're involved in sports. They're involved in church. . . . There's not any discipline in our house at all much because they follow all the rules and they do their chores. . . . They're doing great in school. Their teachers are crazy about them. They've got friends, their playmates. There's not temper fits anymore. There's no lying.

Janet stated that, since the children had come to live with her in March 2011, they were able to pass all of their classes, except that C.T.M. failed science because he was unable to bring his very low grade up to passing. Neither boy received any tardies, and H.T.M. was absent only two days, due to a strep throat infection.

Janet also testified that she did not believe that she and Marca would be successful joint managing conservators because she and Jerry would "live in fear

27

all the time" that Marca would manipulate the boys into making false accusations against them. Janet stated that, in the past, Marca "told the kids . . . that we're watching and recording everything they say and do and we have cameras all over our house," which was not true. She testified that the boys believed their mother at the time, although now they understand it was not true. Janet also testified that Marca "repeatedly" made reports to DFPS against her and Jerry and that none of them had been found valid.

Janet testified regarding why she and Jerry chose to intervene in the lawsuit:

I was told that if I didn't intervene—DFPS, they asked me if there was a licensed, anybody foster licensed in our family, and I said, "no."
And they said, well, you might want to intervene in this case because these children are most likely headed, 99 percent headed to a foster home. And we did not want to allow those children to go to a foster home. We've been taking care of them ourself [sic].

The trial court entered its final "Order in Suit to Modify Parent-Child Relationship," which removed Mark and Marca as joint managing conservators and appointed Janet and Jerry as C.T.M.'s and H.T.M.'s managing conservators. Mark and Marca were appointed possessory conservators. The trial court allowed Marca visitation with the children on each Saturday and Sunday following the second and fourth Friday of every month for a period of eight hours each day. The trial court ordered that Marca's visitation with the children be supervised, that Marca's telephone contact with the children be monitored by Janet or Jerry, or by some other competent adult appointed by Janet or Jerry, and that Marca have no

other contact, electronic or otherwise, outside of the supervised visitation. Mark and Marca were also ordered to pay child support to Janet and Jerry.

## Marca's Challenge to Temporary Orders

In her first issue and part of her third issue, Marca argues that the trial court erred in entering various temporary orders awarding visitation and eventually temporary joint managing conservatorship of C.T.M and H.T.M. to Janet and Jerry. However, the trial court subsequently entered a final order awarding Janet and Jerry managing conservatorship of the children. Because a final order has been entered in this case, Marca's challenges to the temporary orders are moot. *See L.F. v. Dep't of Family & Protective Servs.*, No. 01–10–01148–CV, 2012 WL 1564547, at *14 (Tex. App.—Houston [1st Dist.] May 3, 2012, pet. denied) (mem. op.) (citing *Rafferty v. Finstat*, 903 S.W.3d 374, 378 (Tex. App.—Houston [1st Dist.] 1995, writ denied) ("In general, temporary orders of a trial court issued during the pendency of a proceeding are superseded by the trial court's final order.")).

We overrule Marca's first issue and the portion of her third issue complaining of the trial court's temporary orders.

## Janet and Jerry's Standing

In her second issue and part of her third issue, Marca argues that the trial court erred in determining that Janet and Jerry had standing to intervene in this modification suit. We observe that the record does not contain a copy of Janet and

29

Jerry's plea in intervention, which the parties agree was filed in October 2010.[3]

Under Texas law, "[a]ny party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." TEX. R. CIV. P. 60. The record does not contain a motion to strike or other objection to the intervention, and we have no record of a hearing on Janet and Jerry's plea in intervention, nor is it clear that such a hearing was ever held. Thus, we conclude that no objection to intervention was made in the trial court.

Standing, however, is implicit in the concept of subject-matter jurisdiction, and it is a threshold issue in a child custody proceeding. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993); *In re SSJ-J*, 153 S.W.3d 132, 134 (Tex. App.—San Antonio 2004, no pet.). Whether a party has standing to pursue a cause of action is a question of law that we review de novo. *In re SSJ-J*, 153 S.W.3d at 134.

---

[3] The parties included various copies of the plea in intervention and an amended plea in intervention in the appendix to their briefs. However, documents attached to briefs are not part of the record of the case and cannot be considered by this Court. *See Samara v. Samara*, 52 S.W.3d 455, 456 n.1 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (holding that attachment of documents as exhibits or appendices to briefs is not formal inclusion in record on appeal and, thus, such documents cannot be considered); *see also Siefkas v. Siefkas*, 902 S.W.2d 72, 74 (Tex. App.—El Paso 1995, no writ) (holding that, generally, appellate courts may not consider matters outside appellate record).

When, as here, the trial court does not make separate findings of fact and conclusions of law, we imply the findings necessary to support the judgment.[4] *In re S.M.D.*, 329 S.W.3d 8, 13 (Tex. App.—San Antonio 2010, pet. dism'd) (citing *Worford v. Stamper*, 801 S.W.2d at 108, 109 (Tex. 1990)). We review the entire record to determine if the trial court's implied findings are supported by any evidence. *Id.* (citing *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 853 (Tex. 2000)). Here, we use the statutory framework provided by the Family Code to determine whether Janet and Jerry had standing to intervene in the suit to modify the child custody arrangements. *See Atty. Gen. of Tex. v. Crawford*, 332 S.W.3d 858, 862 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re N.L.D.*, 344 S.W.3d 33, 37 (Tex. App.—Texarkana 2011, no pet.).

Family Code section 102.004 provides that

> the court may grant a grandparent or other person deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit . . . if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both

---

[4] Marca argues in her sixth issue that she properly requested findings of fact and conclusions of law and that the trial court erred in failing to make them. *See Baltzer v. Medina*, 240 S.W.3d 469, 473 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (stating that trial court must file written findings of fact and conclusions of law *when timely requested by party*) (emphasis added) (citing TEX. R. CIV. P. 296, 297). However, the record does not contain any such request. *See Stangel v. Perkins*, 87 S.W.3d 706, 709 (Tex. App.—Dallas 2002, no pet.) (holding that failure to timely and properly request findings and conclusions does not preserve error). Again, Marca attached documents concerning her request for findings and conclusions as appendices to her brief, but such documents are not part of the record and we may not consider them. *See Samara*, 52 S.W.3d at 456 n.1; *Siefkas*, 902 S.W.2d at 74. We overrule Marca's sixth issue.

31

parents as joint managing conservators would significantly impair the child's physical health or emotional development.

TEX. FAM. CODE ANN. § 102.004(b) (Vernon 2008). Thus, section 102.004(b) provides that a grandparent who does not otherwise have standing to file an original suit may nevertheless intervene in a pending suit if the trial court determines that appointment of one or both parents as managing conservators would significantly impair the child's physical health or emotional development. *In re M.J.G.*, 248 S.W.3d 753, 757 (Tex. App.—Fort Worth 2008, no pet.); *see also In re S.M.D.*, 329 S.W.3d at 15 ("[T]he grandparent must make the same showing to establish standing as a nonparent must make to overcome the presumption that a parent is to be named managing conservator.") (citing TEX. FAM. CODE ANN. § 153.131 (Vernon 2008)).

In a family law case, when the petitioner is statutorily required to establish standing with "satisfactory proof," the evidentiary standard is preponderance of the evidence. *In re S.M.D.*, 329 S.W.3d at 13. The burden of proof is on the party asserting standing, and the petitioner must show that the facts establishing standing existed at the time the petition was filed in the trial court. *See id.*

To make the showing required by section 102.004(b), "the nonparent must 'offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child.'" *Id.* at 16 (quoting *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex.

32

1990) (construing section 153.131)). "The evidence must support a logical inference that the specific, identifiable behavior or conduct will probably result in the child being emotionally impaired or physically harmed," and evidence that "merely raises a surmise or speculation of possible harm" is insufficient to establish that inference. *Id.* (citing *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.)). Furthermore, the nonparent's burden is not met by evidence that she would be a better custodian of the child, that she has a strong and on-going relationship with the child, or that the parent would not have been a proper custodian in the past. *Id.* (citing *Critz v. Critz*, 297 S.W.3d 464, 474 (Tex. App.—Fort Worth 2009, no pet.)); *see also May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) ("If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling.").

Although the trial court did not make any express findings of fact, it impliedly found that when Janet and Jerry filed their petition in intervention in October 2010, Marca's appointment as managing conservator would significantly impair C.T.M.'s and H.T.M.'s physical health or emotional development.[5] This

---

[5] Mark settled his interest in this case through mediation and does not challenge the trial court's judgment on appeal. Thus, we do not address any arguments or evidence regarding his ability to serve as managing conservator of the children.

33

implied finding is supported by the record. At the June 24, 2010 hearing, Bushman, the amicus attorney appointed on the children's behalf, alleged that both Mark and Marca had "caused the children to be in situations which cause them to sustain mental and emotional injuries, resulting in observable and material impairment in their growth, development and psychological functioning." Marca acknowledged that DFPS was conducting an investigation into the welfare of the children.

In July 2010, Bushman moved for temporary orders, arguing that Marca was making false accusations against Janet, Jerry, and Mark that were damaging the children and that her behavior toward the children had risen to the level of emotional abuse. Janet testified at this hearing that Marca had made disparaging remarks about Mark that the boys repeated, including making statements that Mark was a "queer" and a "fag" who "likes little boys" and that Mark abused drugs. Janet testified that Marca also had made false accusations to DFPS against Mark and herself that had proven unfounded to the best of her knowledge. Janet testified that she was concerned about the boys remaining in Marca's care because Marca was manipulating them and teaching them to lie.

At the March 23, 2011 hearing, Bushman provided evidence regarding H.T.M.'s and C.T.M.'s poor school attendance and performance records and other evidence of the children's extreme behavioral issues during the time they were

34

living with Marca.[6] The record included evidence that the older child, C.T.M., had multiple absences in the semester immediately prior to the hearing and was failing several classes. There was also evidence that H.T.M. had shown behavioral problems at school that had led to lunch detentions and other disciplinary problems, that his grades were suffering, and that his bad behavior was escalating. When the trial court subsequently asked Marca about the reasons underlying the children's poor school performance and poor behavior, Marca recited numerous problems relating to previous disputes with Mark, Janet, and Jerry, some of which resulted in reports to DFPS or to police, but she did not acknowledge any failure of her own that contributed to the boys' attendance and school problems. She testified that she thought the boys had been doing better in the past month or two.

Bushman also stated that Marca had not fully complied with the trial court's orders that the children attend counseling and was uncooperative in the investigation into the children's medical and school records. Marca acknowledged at the hearing that she had not had the children in counseling following DFPS's

---

[6] Marca argues in her brief that the trial court erred in relying on any evidence obtained at this hearing because it was not a full evidentiary hearing. However, the record reflects that the trial court swore in any participants who intended to testify, if necessary, and that all parties, including Marca, had an opportunity to present information to the trial court. In fact, the trial court questioned her at length. Marca does not identify what evidence, if any, would have been presented had the hearing been held in a different format, nor does she identify any evidence or other information that she was prohibited from presenting to the trial court in the course of the litigation. Thus, we conclude that we may consider the records of these proceedings in determining whether the record supported the trial court's implied findings on the issue of Janet and Jerry's standing.

termination of their in-home services, but stated that she had attempted to set up more counseling. Bushman also asserted that Marca involved the children in the on-going litigation to an unnecessary degree, and she gave the example that H.T.M. knew in advance that Bushman would be meeting with people at his school and was very worried about what would happen. Bushman stated that Marca's actions involving the children in the litigation caused the children emotional distress.

Bushman and the DFPS caseworker both agreed that the children needed to be removed from Marca's custody. The DFPS caseworker cited "17 allegations and referrals [that] CPS has had to investigate over the past few years with this family" as causing "emotional trauma" for the children. However, there was no evidence that any of those allegations had been substantiated. Bushman informed the court that residential treatment would help the children, but no one involved in the case could afford it. In light of those financial constraints, Bushman believed placement with Janet and Jerry was in the children's best interest.

Two days later, when the court convened another hearing to enter the order giving Janet and Jerry temporary managing conservatorship of the children, Bushman informed the court that Marca had again involved the children in litigation by giving them unnecessary details about the prior hearing. Janet and Jerry's attorney informed the court that Marca had concealed notes to the boys

36

inside their stuffed animals, telling them that she loved them and to be good so that they could come back home, in spite of promising the court that she would not violate the court's order not to contact the children. These letters were introduced into evidence and included in the record.

Thus, the records of these hearings established specific actions and omissions that demonstrated that awarding Marca custody would result in emotional harm to C.T.M. and H.T.M. *See In re S.M.D.*, 329 S.W.3d at 16. It raised more than surmise or speculation of possible harm—Bushman stated that Marca's failure to provide her children with the support they needed to attend school on a regular basis, to adequately discipline them, or to provide them with counseling in compliance with the trial court's orders was having a dire effect on the children's emotional lives. C.T.M. had many absences and suspensions and was failing several classes. H.T.M. also had angry outbursts and mounting behavioral and performance problems at school. The DFPS caseworker testified that the numerous referrals to CPS and the involvement of the police, many of which were instigated by Marca and later found to be meritless, were causing the boys emotional harm. And the record contained evidence that Marca was not willing to cooperate with the trial court's orders, such as providing regular counseling for the boys, helping Bushman with her investigation of the boys'

medical and educational records, or refraining from discussing the litigation with the boys and from having non-approved communication with them.

Therefore, we conclude that a preponderance of the evidence supported the trial court's implied finding that Marca was not, at the time of Janet and Jerry's intervention, a suitable person to have custody of C.T.M. and H.T.M. and that appointing her as the children's managing conservator would have significantly impaired their emotional development. *See* TEX. FAM. CODE ANN. § 102.004(b); *In re S.M.D.*, 329 S.W.3d at 14. Accordingly, Janet and Jerry had standing to intervene in the suit. *See* TEX. FAM. CODE ANN. § 102.004(b).

We overrule Marca's second issue and the part of her third issue addressing Janet and Jerry's standing to intervene.

## Sufficiency of the Evidence

In the remainder of her third issue, Marca argues that the trial court abused its discretion in awarding Janet and Jerry sole managing conservatorship. She asserts that Family Code section 153.131 "creates a strong presumption that a child's best interests are served when a natural parent is appointed as managing conservator." In her fourth issue, Marca argues that the evidence was legally and factually insufficient to rebut the presumption that it would be in the children's best interest to have a parent appointed the managing conservator. In her fifth issue, Marca argues that the trial court abused its discretion in determining that her

possession of and access to the children should be limited to supervised visitation, again arguing that there was no evidence or insufficient evidence demonstrating that "any harm would come to the children if they continued to be in their mother's possession" or otherwise overcoming the presumption that appointing her managing conservator was in the children's best interest.

## A. Applicability of Chapter 153's Parental Presumption

The crux of all of these issues is Marca's contention that section 153.131's parental presumption applies to this modification suit and that there was not sufficient evidence to rebut that presumption.

Janet and Jerry argue that the parental presumption does not apply in this case because the suit was a conservatorship modification and not an original conservatorship determination. *See In re C.A.M.M.*, 243 S.W.3d 211, 216 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("[I]n a suit for modification, the trial court does not presume that appointment of the surviving parent as sole managing conservator is in the child's best interest.") (citing *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)).

In *In re V.L.K.*, the supreme court acknowledged that "[t]he presumption that the best interest of the child is served by awarding custody to the parent is deeply embedded in Texas law." 24 S.W.3d at 341. It cited Family Code section

153.131(a), from Chapter 153 governing original custody determinations, which provides:

(a)     [U]nless the court finds that the appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

(b)     It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.

TEX. FAM. CODE ANN. § 153.131.

However, the supreme court observed that section 153.131 applied to original custody disputes. It cited section 156.101, providing the grounds for modifying conservatorship, and it observed that "Chapter 156 does not provide for a parental presumption in modification suits." *In re V.L.K.*, 24 S.W.3d at 342.

The supreme court concluded that Chapter 153's parental presumption does not apply in a Chapter 156 modification proceeding. *Id.* at 344. In reaching this holding, the court observed that "Chapter 153 and Chapter 156 are distinct statutory schemes that involve different issues" and that modification suits "raise additional policy concerns such as stability for the child and the need to prevent constant litigation in child custody cases." *Id.* at 343. It held, "Because the Legislature did not express its intent to apply the presumption [from Chapter 153]

40

in Chapter 156 modification suits, courts should not apply the presumption in those cases. The court should instruct the jury by tracking the language of Family Code [section] 156.101. . . ." *Id.* Various courts of appeals have also held that the parental presumption does not apply in modification suits. *See, e.g.*, *In re C.A.M.M.*, 243 S.W.3d at 216; *In re A.D.H.*, 979 S.W.2d 445, 447 (Tex. App.— Beaumont 1998, no pet.).

The present suit originated when Mark filed a petition for modification of the conservatorship order entered as part of his and Marca's divorce proceeding. His suit was permitted by Chapter 156. *See, e.g.*, TEX. FAM. CODE ANN. § 156.101(a)(1) (Vernon Supp. 2012) (providing that court may modify conservatorship order if modification is in child's best interest and circumstances of party affected by order have materially and substantially changed); *id.* § 156.102 (Vernon Supp. 2012) (providing for modification of exclusive right to determine primary residence of child within one year of order with affidavit averring that child's present environment may endanger child's physical health or significantly impair child's emotional development); *id.* § 156.401 (Vernon Supp. 2012) (providing grounds for modification of child support). Thus, the parental presumption does not apply in this proceeding. *See In re V.L.K.*, 24 S.W.3d at 343–44.

Furthermore, as we discussed above, Janet and Jerry were required to establish that Marca's appointment as managing conservator would significantly impair the children's physical health or emotional development to have standing to intervene in this suit. *See* TEX. FAM. CODE ANN. § 102.004(b); *In re S.M.D.*, 329 S.W.3d at 15. This is the same standard provided in section 153.131's parental presumption. *See In re S.M.D.*, 329 S.W.3d at 15 (comparing sections 102.004(b) and 153.131). We have already concluded that the evidence was sufficient to support the trial court's implied finding that Marca's appointment as managing conservator would significantly impair the children's emotional development. Thus, even if we were to conclude that the parental presumption applied, we would hold that Janet and Jerry effectively overcame it in order to establish their standing to intervene in this modification suit.

We overrule Marca's arguments that section 153.131's parental presumption applies in this case.

## B. Trial Court's Custody and Visitation Order

Because we conclude that the parental presumption does not apply, we construe Marca's issues as a complaint that the evidence was insufficient to support the trial court's judgment awarding conservatorship of the children to Janet and Jerry under Family Code Chapter 156 and limiting Marca's possession and visitation accordingly.

42

We review conservatorship determinations for an abuse of discretion and may reverse the trial court's decision only if it is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). "The trial court is given wide latitude in determining the best interests of a minor child." *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.). Thus, to determine whether a trial court abused its discretion, the appellate court must decide whether the court acted without reference to any guiding rules or principles, that is, whether its decision was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *In re M.M.M.*, 307 S.W.3d at 849. "An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence." *In re M.M.M.*, 307 S.W.3d at 849 (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding)). Nor does an abuse of discretion occur so long as there is some evidence of substantive and probative character to support the trial court's decision. *Id.* (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002)). The findings underlying a conservatorship decision are subject to ordinary legal and factual sufficiency review on appeal. *In re J.A.J.*, 243 S.W.3d at 616 n.5.

In conducting a legal sufficiency review in conservatorship cases, an appellate court reviews all the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact-finder could do so and disregarding

43

contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). In reviewing a no-evidence point, the appellate court must view evidence in the light that tends to support the finding of the disputed fact, and it must disregard all evidence and inferences to contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 13–14 (Tex. 2002); *Lewelling*, 796 S.W.2d at 166; *In re D.A.*, 307 S.W.3d 556, 561 (Tex. App.—Dallas 2010, no pet.). The appellate court will sustain a legal-sufficiency or "no-evidence" challenge if (1) the record shows a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller,* 168 S.W.3d at 810. Thus, the court will sustain a legal sufficiency challenge only when the evidence is "so weak as to do no more than create a mere surmise or suspicion." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006).

To determine whether the evidence is factually sufficient to support the trial court's order, we must consider, weigh, and examine all of the evidence that supports or contradicts the fact-finder's determination. *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We may set aside a verdict only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. *Cain v. Bain*, 709 S.W.2d

44

175, 176 (Tex. 1986) (per curiam). When conducting a factual sufficiency review, we must not merely substitute our judgment for that of the fact-finder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The fact-finder is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

The Family Code permits modification of a conservatorship order or an order establishing possession and access if the modification is in the child's best interest and the circumstances of the child, conservator, or other party affected by the order have "materially and substantially changed." TEX. FAM. CODE ANN. § 156.101(a). Marca does not present any challenge in her appellate brief to the "material and substantial change" prong; however, she does challenge the trial court's implied findings that appointing Janet and Jerry as the children's managing conservators and limiting her own possession and access was in the children's best interest.

In determining the best interest of a child, courts consider the following non-exhaustive factors:

 (1) the desires of the child;

 (2) the emotional and physical needs of the child now and in the future;

 (3) the emotional and physical danger to the child now and in the future;

 (4) the parental abilities of the individual seeking custody;

45

(5)    the programs available to assist the individual to promote the best interest of the child;

(6)    the plans for the child by the individual or by the agency seeking custody;

(7)    the stability of the home or proposed placement;

(8)    the acts or omissions of the parent, or potential conservator, that may indicate that the existing relationship is not a proper one; and

(9)    any excuse for the acts or omissions of the parent or potential conservator.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re Doe 2*, 19 S.W.3d 278, 282 n.20 (Tex. 2000) (recognizing that intermediate appellate courts use *Holley* factors to ascertain best interest of child in conservatorship cases).

Regarding the desires of the children, Dr. Michael testified that the boys seemed ambivalent about their future living arrangements—at times they expressed a desire to live with Marca while at other times they indicated that they would like to stay with Janet and Jerry. Therefore, this factor neither supports nor undermines the trial court's implied finding that naming Janet and Jerry as the boys' managing conservators was in their best interest. *See Holley*, 544 S.W.2d at 371–72.

Regarding the children's emotional needs, Marca's parenting abilities and ability to meet the children's emotional needs, and her past failures in meeting those needs, the evidence demonstrated that the boys had a strong need for stability, regular discipline, and support in their educational and emotional

46

development that they did not get from Marca. While C.T.M. and H.T.M. were in her custody, they had severe behavioral and academic performance problems at school, had multiple absences and tardies, and did not regularly attend court-ordered counseling. Ashley Hill testified that the boys were disrespectful and unhappy when they were living with Marca and that she did not believe that Marca punished them for their disrespectful behavior. Gayle Coulam also testified that when the boys lived with Marca the relationship between them was strained because of pressures on C.T.M. to act as a parent to H.T.M. She testified that she "never saw a happy relationship" between Marca and the boys. Janet likewise testified that the boys were "angry" and "sad" while they lived with their mother, and that H.T.M. was "scared" of both C.T.M. and Marca. Janet stated that Marca referred to C.T.M. as the "man of the house" and that C.T.M. controlled H.T.M.'s "every move."

Additionally, there was evidence that Marca had made several false accusations of abuse against Janet and Mark, that she manipulated the children into making false accusations and derogatory comments, and that this placed the children in emotional turmoil. Employees of the FBCSO both testified regarding a report of assault that Marca made against Janet that was eventually closed with no action taken.

Marca attributed the boys' difficulties in school to the emotional distress they were all facing during the course of acrimonious litigation, and she repeatedly blamed the behavior of others, including Mark, Janet, and Jerry. She stated that she was partially to blame because she remained in a bad situation longer than she should have and that she tried the best she could. The court ordered that she attend individual counseling, but there was no evidence regarding the outcome of such counseling. Dr. Michael, the boys' therapist, testified that although Marca told him that she had taken and done well in parenting classes her participation in the classes apparently "did not lead to particularly more effective parenting on her part in the home."

Furthermore, Marca repeatedly demonstrated an unwillingness to cooperate with the trial court's orders, and Dr. Michael testified that his recommendation that Marca could have unsupervised visitation with the boys was based on the understanding that Marca would meet certain requirements of the court, including seeking individual therapy and refraining from making disparaging remarks about Janet, Jerry, and Mark. The boys did not attend court-ordered counseling on a regular basis when they lived with Marca, nor did C.T.M. attend mandatory tutoring when he lived with Marca, according to both the school personnel and Janet. Thus, the evidence demonstrates that Marca did not show a willingness or ability to participate in any of the programs available to assist her in promoting

C.T.M.'s or H.T.M.'s best interest. All of these factors support the trial court's implied findings that leaving Marca as the children's managing conservator was not in their best interest and that limiting her visitation with them to supervised visitation was in their best interest. *See id.*

Regarding the appropriateness of the boys' placement with Janet and Jerry, the evidence demonstrated that the couple had been a steadying influence in the children's lives over a course of several years and that Marca had regularly relied on them for child care prior to the issues that were raised during this litigation. Ashley Hill and Gail Coulam both testified that the boys were doing much better since they began living with Janet and Jerry. They seemed happier and were more emotionally stable, and their relationship with each other was improved. Janet testified regarding the boys' current living situation, stating that they were happy and stable, were involved in sports and church, and were forming appropriate relationships. She further stated that since the boys had begun living with her their performance and behavior at school had drastically improved. Thus, the evidence shows that Janet and Jerry's plans for the children and suitability of their home were factors in support of the trial court's implied finding that naming Janet and Jerry as the boys' managing conservators was in their best interest. *See id.*

We conclude that the trial court's implied finding that the children's best interest was served by appointing Janet and Jerry as the children's managing

conservators and limiting Marca to supervised visitation is supported by legally and factually sufficient evidence. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176. Accordingly, we cannot say that the trial court abused its discretion in making its conservatorship determination and limiting Marca's visitation. *See J.A.J.*, 243 S.W.3d at 616; *Low*, 221 S.W.3d at 614.

We overrule Marca's third, fourth, and fifth issues.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.