**Opinion issued March 12, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-18-00840-CV

## NO. 01-18-00843-CV

_____

### IN THE INTEREST OF K.D.B., A Child

### IN THE INTEREST OF L.R.A., A Child

---

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 2014-61822 and 2003-69065**

---

## MEMORANDUM OPINION

In these consolidated cases, the Texas Department of Family and Protective

Services (DFPS or the Department) sought to modify the conservatorship and

possession exercised by appellant A.L.B. (Mother) over her two minor children,

K.D.B. (Kevin) and L.R.A. (Laura).[1] The trial court granted DFPS's petition to modify and named Kevin's father, Ken, sole managing conservator over Kevin and named Laura's father, Lance, sole managing conservator over Laura. The trial court named Mother possessory conservator over both children and required that her visitation with the children be supervised.[2] In three issues on appeal, Mother contends that the trial court erred by (1) finding that a material and substantial change in circumstances had occurred justifying modification and that the modification was in the children's best interest; (2) appointing Ken and Lance as sole managing conservators and Mother as possessory conservator; and (3) requiring that Mother's visitation with the children be supervised.

We affirm.

## Background

Laura was born in July 2003. In December 2003, the trial court entered an order adjudicating Lance as Laura's biological father. In this order, the trial court named Mother and Lance as joint managing conservators over Laura and gave Mother the exclusive right to designate Laura's primary residence. The trial court

---

[1] In this opinion, we refer to the minor children and the children's fathers by pseudonyms to protect their identities.

[2] The case involving conservatorship of Kevin was tried in trial court cause number 2014-61822 and resulted in appellate cause number 01-18-00840-CV. The case involving conservatorship of Laura was tried in trial court cause number 2003-69065 and resulted in appellate cause number 01-18-00843-CV.

2

imposed a standard possession order setting out Lance's possession of Laura and ordered Lance to pay current and retroactive child support to Mother.

Kevin was born in August 2012. In October 2014, the Texas Attorney General's Office filed a petition to establish the parent-child relationship between Kevin and Ken. After Ken, Kevin, and Mother all underwent DNA testing, the trial court entered an order in April 2015 adjudicating Ken as Kevin's biological father and establishing a parent-child relationship between Ken and Kevin. The trial court appointed Mother and Ken as joint managing conservators over Kevin and gave Mother the exclusive right to designate Kevin's primary residence. The trial court imposed a standard possession order and required Ken to pay current and retroactive child support to Mother.

On May 30, 2017, DFPS moved to modify the conservatorship orders for both Laura and Kevin and, in the alternative, sought termination of Mother's, Lance's, and Ken's parental rights.[3] DFPS alleged that the circumstances of the children or a conservator had materially and substantially changed since the trial court entered the

---

[3] DFPS filed its modification motion in the cause number relating to Laura in the 312th District Court of Harris County on May 30, 2017. This motion referenced both Laura and Kevin. DFPS filed a substantively identical motion in the cause number relating to Kevin in the 310th District Court of Harris County on June 30, 2017. On July 5, 2017, the presiding judge of the 310th District Court transferred the case relating to Kevin to the 312th District Court to be consolidated with the case relating to Laura. DFPS then filed a second motion to modify Kevin's conservatorship on July 6, 2017.

3

December 2003 order pertaining to Laura and since the April 2015 order pertaining to Kevin. After an adversarial hearing, the trial court appointed DFPS as Laura's and Kevin's temporary managing conservator.

DFPS created a family service plan for Mother, Lance, and Ken. At an August 2017 status hearing, the trial court approved the service plan and adopted the plan as an order of the court. The service plan stated the following under a heading entitled "Reason for Child Protective Services Involvement":

> On November 28th,[4] the Texas Department of Family and Protective Services (hereinafter "CPS") received a report alleging Neglectful Supervision of unknown male child age 3. The referral stated that toddler child was found in the middle of the road. The child was not wearing any shoes, socks, or shirt. The child was found crying for his mother. The child's home was found, but the door was open. Grandmother was inside of the home and appeared to be inebriated. Mother was not inside of the home. The child was not given to the grandmother due to her condition. CPS assistance with the alleged victim is being requested at this time.
>
> On December 5th, 2016[, t]he Department of Family and Protective Services received a second referral alleging the Neglectful Supervision of 4 year old [Kevin] and 13 year old [Laura] by [Mother]. The referral stated that the 4 year old child is often times seen wandering the neighborhood unsupervised. The neighbors always have to take the child back home when he is found wandering. The police have also returned the child home after being found wandering around. The children are seen with dirty clothes and filthy in appearance.
>
> There is drug use occurring in the home on a daily basis. There may also be alcohol use in the home. The adults in the home fight over the drugs and money. [Mother] is known to be violent. Law enforcement has been to the home due to the drugs. It is not known if the substances

---

[4] The service plan does not state a year for this referral.

are being used around the children. There are always lots of people seen coming and going from the home.

No known gang activity or weapons in the home. Domestic violence in the home is unknown.

The service plan required Mother, Lance, and Ken to participate in a substance abuse assessment and submit to random drug testing. The plan also required each of the parents to maintain regular employment, to refrain from engaging in illegal activities, to maintain safe and stable housing, to participate in a psychosocial evaluation, and to participate in parenting classes. The service plan further required Mother to participate in Narcotics Anonymous/Alcoholics Anonymous ("NA/AA") meetings at least twice per week, to participate in individual counseling until discharged, and to participate in family counseling with the children.

The trial court held a final bench trial on the cases in August 2018. Candis Benoit, the DFPS caseworker assigned to the cases, testified that Laura had been living with Lance since March 2018 and that Kevin had been living with Ken since June 2018. She stated that she had no concerns with the children living with their respective fathers and that the children's fathers were meeting all of the children's needs. Kevin had had some behavioral issues during the pendency of the case, but both he and Laura were doing well in their placements. Benoit stated that both Lance and Ken had completed all services required of them by the service plan. She testified that the Department was requesting that the children remain in their current

placements, that Lance be named Laura's sole managing conservator, that Ken be named Kevin's sole managing conservator, and that Mother be named possessory conservator of both children.

Benoit agreed with DFPS's counsel that the cases "started out as participation in services," but "[t]here were some issues with compliance and the case escalated to a conservatorship case." She stated that a service plan was in place for Mother. Mother completed the required psychological evaluation, and she participated in substance abuse treatment at a facility called Career and Recovery, but she was unsuccessfully discharged from that program in March 2018. Mother participated in drug testing at Career and Recovery, but she did not participate in any of the random drug tests requested by DFPS. Mother's drug testing results for Career and Recovery demonstrated that she tested positive for PCP and she tested positive for marijuana in May 2018. Benoit testified that, to her knowledge, Mother had not participated in any other substance abuse treatment program after being discharged from Career and Recovery.

Benoit further testified that Mother still had several services left to complete, including participating in NA/AA meetings, parenting classes, anger management classes, and individual and family counseling. Mother had to demonstrate that she could maintain safe and stable housing, and she needed to successfully complete substance abuse treatment. Benoit stated that DFPS's major concern with Mother

6

was her sobriety. DFPS also had concerns arising out of Mother's psychological assessment, during which she made "threatening statements about the folks in this case." Due to DFPS's concerns about Mother's mental health and her sobriety, the Department believed that keeping the children with their respective fathers was in their best interest.

With respect to Mother's visitation with the children, Benoit stated that, the last time she had spoken with Lance and Ken, they were not comfortable supervising Mother's visitation. The Department thus requested that if the fathers and Mother could not come up with a mutually-agreeable person to supervise Mother's visitation, the visitation should be done through a supervisory program. Benoit also testified that Laura, who was fifteen at the time of trial, had a cell phone and occasionally communicated with Mother in that manner. Benoit believed that it was in Laura's best interest to allow phone communications with Mother to continue and that it was up to Lance to make sure the communications were appropriate. She stated that the Department was not seeking to prevent electronic communication between Mother and Laura, and she agreed that Laura loved Mother and wanted to stay in contact with her.

Benoit also agreed with Mother's counsel that, throughout the pendency of the case, Mother had consistently wanted to see her children, and she had been present for every court hearing. Benoit agreed that Mother had had Kevin enrolled

in school. She also agreed that Mother had never indicated that she wished to harm Kevin or Laura. Benoit testified that if Mother wanted to meet up with Laura at the mall, for example, it would be up to Lance to decide whether to allow that, but the Department did not want Mother meeting with Laura alone due to Mother's "behaviors on top of the positive drug tests that we have received through the provider that she went to." Benoit stated that Mother had informed her that she worked as a caregiver for the elderly, but Mother had not told Benoit that she had a stable place to live.

On examination by Ken's counsel, Benoit testified that Ken had completed all services required by the service plan, that Ken had demonstrated that he was benefitting from the services provided to him, and that he felt as though participating in the services had made him a better father. She testified that Kevin is very happy in Ken's home and that he is thriving there. She stated that Ken's home was clean and stable, and Ken and his partner had demonstrated that they were able to provide for Kevin's emotional and physical needs. She agreed that Ken had expressed to her that he wants Kevin to complete school and go to college, and she had made Ken aware that Kevin would be eligible for a college tuition waiver. Benoit also agreed that Ken wants to avoid "drama" with Mother and that he believed it would be best for him and Mother to mutually agree on someone to supervise Mother's visits with

8

Kevin. Benoit agreed that Ken did not want to prevent Mother from having access to Kevin.

Ken testified that Kevin had been living in his home for a couple of months, that everything was fine, and that Kevin got along well with the other children in his home. Ken did not have any concerns about Kevin being placed with him on a permanent basis, and he believed it would be in Kevin's best interest for him to remain in Ken's home. Ken stated that he had the same concerns as Benoit with regard to Mother having unsupervised visitation with Kevin, and he hoped that he and Mother could agree on someone to supervise Mother's visitation. Upon questioning by the trial court, Ken agreed that if the court modified the conservatorship order to give him primary custody of Kevin his child support obligation should cease. He stated that he had not thought about whether Mother should be required to pay child support to him.

Ken agreed with Mother's counsel that Kevin loves Mother and that Mother loves Kevin. He did not have any fear that Mother would harm Kevin. He would be willing to think of people who could supervise Mother's visitation with Kevin, and he named his younger sister as an example. He stated that he did not wish to keep Mother from seeing Kevin or from spending holidays with him.

Lance testified that Laura had been living with him and his mother, Laura's grandmother, since March 2018, and he had no concerns with her remaining in his

house. Lance also stated that he was not comfortable supervising Mother's visitation with Laura, but he mentioned an aunt as a possible person who could supervise, and he understood that if he and Mother could not agree on a supervisor, a supervisory program would be used. He also shared the Department's concerns about Mother's having unsupervised visitation, and he believed that supervised visitation would be in Laura's best interest. Lance also testified that Laura and Mother communicated by cell phone, that the communications had been appropriate so far, and that he would stop the communications if they became inappropriate. Lance also requested that his child support obligation stop, and he stated that he would "leave that up to the Court to decide" whether to impose a support obligation on Mother.

Lance agreed with Mother's counsel that Laura was not afraid of Mother and that they communicated frequently. Although he had no concern that Mother, if left unsupervised with Laura, would kidnap her or leave the state with her, he still was not comfortable with Mother's having unsupervised visitation, even if that visitation occurred in a public place like a mall.

Lance also testified that Laura and Kevin were close and that Laura wished to maintain her relationship with Kevin. Lance stated that he would help ensure that Laura and Kevin could stay in contact, and he agreed to work with Ken in that regard.

Mother testified that she did not agree that Lance and Ken should have primary custody of Laura and Kevin, stating, "They could have had them a long time

ago. They left. They chose to live their life. And now it's about money and they doing what they wanting them to do." Mother stated, "All CPS is worried about is a check" and "[k]eep[ing] the kids in the circle so they can get paid." She did not agree that supervised visitation was necessary because she loved the children and she would not hurt them. She also testified, "I made their program [Career and Recovery], I just never did go get discharged. I have somewhere to stay and I work and I'm not doing nothing," referring to using drugs.

Mother testified that she worked for a home delivery company and as a caregiver for the elderly and that she had two patients at the time of trial. She stated that she was able to take care of her children. She also stated, "I want to see my kids. I don't need nobody around me and my kids. [The children] don't want that either. Nobody wants that but her back there [Benoit] to keep her money flowing to pay for her new truck." Mother stated that she and Lance could work together with regard to Laura, and she indicated that she had had regular visitations with Laura, but she had not seen Kevin since he had been placed with Ken. With respect to completing the substance abuse treatment program, Mother testified:

> Yes, I did what I needed. I took out my time and went and did that, lost money doing that. Losing money every time I come here. While everybody else making their money clocking they dollars, I'm losing money. Everybody want to keep this going to keep money going. But it's more—it's more than money. All this money that they done slung—my tax dollars slung around on therapists. No, it ain't nothing wrong with my kids but them. My daughter is just stressing because she don't want to be there. You know what I'm saying? All of this is—my kids

not used to all of this. Ain't nothing wrong with my kids. You don't send kids to no doctor, you don't put kids on medicine without they momma knowing—without they mother consent.

So, she [Benoit] needs to watch the bad she doing with my kids. She needs to watch her kids, because what you do to somebody else comes back on you ten times. And I already told her I'm not worried about that lady back there. She . . . that is a paycheck to her. When this case over with it's going to be another child.

Mother agreed that she could get along with both Lance and Ken for the children's sake, stating, "I don't have to like them to get along with them."

On cross-examination, Mother testified that she can set her own hours at her job, working as much or as little as she wants, and that she makes between $25 to $40 per hour. However, Mother testified that she could not afford child support, stating, "I can keep taking care of my children because that's money I earn and he not getting." Mother had the following exchange with Ken's counsel:

Q.     [Mother], you can certainly afford to pay child support?

A.     No, I can't.

Q.     Why can you not afford that?

A.     Because if it come down to pay child support, I ain't going to work because I'm not fixing to give them a dime. I can take care of my own kids. I don't need nobody to raise them up or taking care my kids for me when I been doing it and I'm going to keep doing it.

Q.     So, you're able to make—

A.     So, if it's money you aiming for, I'm through with that conversation, move to the next.

Q. So, you're able to work full time at 25 to $40 per hour, but if you're ordered to pay child support—

A. I'll work zero hours.

Q. Let me finish.

A. Zero.

Q. You're saying that you would intentionally—

A. Intentionally.

Q. —not work?

A. Not work. Because that's all y'all doing putting them there. I don't need nobody taking care of my kids. Something I been doing, I'm going to keep doing it.

Mother also acknowledged on cross-examination that she had not received a certificate for completing any of her services, such as the substance abuse treatment, the anger management classes, and the parenting classes, and she acknowledged that she had tested positive for marijuana and PCP earlier in 2018.

At the close of the hearing, the trial court stated that there is no longer any reason for the Department to be the children's temporary managing conservator. The court found that, with regard to Kevin, there had been a material and substantial change in circumstances since the April 2015 order, and the court named Ken as Kevin's sole managing conservator and Mother as Kevin's possessory conservator. The trial court further ordered that Mother could not attend activities at Kevin's school on an unsupervised basis, and the court ordered Mother's visitation with Kevin to be supervised by someone mutually agreeable to Mother and Ken or by

13

The Visitation Center, part of the Harris County Domestic Relations Office. The court ordered Mother to have at least four hours twice a month of visitation with Kevin. The court also granted Mother electronic communication with Kevin "at all reasonable times." The court terminated Ken's child support obligation and ordered Mother to pay $180 per month in support for Kevin and reimburse Ken $50 per month for Kevin's health insurance.

The trial court made similar findings concerning Laura, including naming Lance as her sole managing conservator and naming Mother as the possessory conservator. The trial court stated that Mother could attend school activities for Laura unsupervised, but otherwise, any other visitation with Laura had to be supervised. The court terminated Lance's child support obligation and ordered Mother to pay $180 per month in child support and $50 per month for health insurance.

The trial court signed written orders memorializing these findings and modifying the prior conservatorship orders for both Laura and Kevin. Mother did not request findings of fact and conclusions of law. This appeal followed.

**Material and Substantial Change in Circumstances**

In her first issue, Mother contends that the trial court abused its discretion when it granted DFPS's motion to modify because DFPS presented insufficient evidence of a material and substantial change in circumstances. She also argues that

14

DFPS presented insufficient evidence that modification of the conservatorship orders was in the children's best interest.

## A. *Standard of Review*

We review a trial court's decision to modify a conservatorship order for an abuse of discretion. *Epps v. Deboise*, 537 S.W.3d 238, 242 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Arredondo v. Betancourt*, 383 S.W.3d 730, 734 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (stating that courts review orders modifying conservatorship for abuse of discretion because trial courts have broad discretion to decide best interest of child in family law matters). A trial court's modification decision will only be disturbed on appeal when it is clear that the trial court acted in an arbitrary or unreasonable manner, without reference to any guiding rules or principles. *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied) ("The mere fact that a trial court decided an issue in a manner differently than an appellate court would under similar circumstances does not establish an abuse of discretion.").

Under the abuse of discretion standard of review, legal and factual sufficiency of the evidence are not independent grounds for error, but are instead factors to be used in assessing whether the trial court abused its discretion. *Arredondo*, 383 S.W.3d at 734. There is no abuse of discretion as long as some evidence of a

15

substantive and probative character exists to support the trial court's decision. *Stamper*, 254 S.W.3d at 542. We must determine whether the trial court (1) had sufficient information on which to exercise its discretion and (2) erred in its application of discretion. *Id.*; *Zeifman*, 212 S.W.3d at 588. When conducting a legal-sufficiency review, we determine whether the evidence would enable reasonable people to reach the judgment being reviewed. *Stamper*, 254 S.W.3d at 542 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We consider favorable evidence if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* If the evidence would enable reasonable and fair-minded people to differ in their conclusions, the factfinder must be allowed to do so, and we cannot substitute our judgment for that of the factfinder as long as the evidence falls within this zone of reasonable disagreement. *Epps*, 537 S.W.3d at 243.

In conducting a factual-sufficiency review, we consider all of the evidence that supports and contradicts the factfinder's determination. *Id.* We may set aside a verdict only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Id.* The factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* When considering whether the trial court erred in its application of discretion, we must determine whether, based on the evidence presented, the trial court made a reasonable decision. *Stamper*, 254 S.W.3d at 542. The trial court is in a better

16

position to decide custody cases because "it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.J.G.*, 540 S.W.3d 44, 56 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)).

## B. *Governing Law*

A court that has continuing, exclusive jurisdiction may modify an order that provides for the conservatorship, support, or possession of and access to a child. TEX. FAM. CODE ANN. § 156.001. Family Code section 156.101 sets out the grounds for modifying a conservatorship order:

> (a) The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:
>
> > (1) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:
> >
> > > (A) the date of the rendition of the order; or
> > >
> > > (B) the date of the signing of a mediated or collaborative law settlement agreement on which the order is based . . . .

*Id.* § 156.101(a); *Epps*, 537 S.W.3d at 243 (stating that court can modify terms of conservatorship order if movant shows (1) material and substantial change

17

warranting modification since date of last order and (2) modification would be in best interest of child). "The change-in-circumstances requirement is a threshold issue for the trial court and is based on a policy of preventing constant re-litigation with respect to children." *Smith v. Karanja*, 546 S.W.3d 734, 738 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("In an effort to ensure stability and continuity for children, Texas law has imposed 'significant hurdles' before a conservatorship order may be modified."). Unlike termination of parental rights cases, in which the statutory grounds for termination must be established by clear and convincing evidence, the standard of proof for conservatorship decisions is preponderance of the evidence. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

"Determination of a substantial and material change is not controlled by a set of guidelines; instead, it is fact specific." *Epps*, 537 S.W.3d at 243. Some examples of material and substantial changes include (1) remarriage by a party, (2) poisoning of the child's mind by a party, (3) change in the home surroundings, (4) mistreatment of the child by a parent or step-parent, and (5) a parent's becoming an improper person to exercise custody. *Smith*, 546 S.W.3d at 741; *In re A.L.E.*, 279 S.W.3d at 428–29 (noting that this list of material changes is "non-comprehensive"). "Changes in a child's home surroundings or circumstances rendering a conservator unsuitable are examples of the material and substantial changes contemplated by section

18

156.101(a)(1)." *In re J.R.P.*, 526 S.W.3d 770, 779 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

To demonstrate that a material and substantial change in circumstances has occurred, the evidence must show the conditions that existed at the time of the prior order as compared to the conditions that existed at the time of the hearing on the motion to modify. *In re L.C.L.*, 396 S.W.3d 712, 718 (Tex. App.—Dallas 2013, no pet.); *In re W.C.B.*, 337 S.W.3d 510, 514 (Tex. App.—Dallas 2011, no pet.) (stating that, to determine if material and substantial change has occurred, "the trial court compares the evidence of the conditions that existed at the time of the entry of the prior order with the evidence of the conditions that existed at the time of the hearing on the petition to modify"); *see Zeifman*, 212 S.W.3d at 594 n.1 (stating that record "must contain both historical and current evidence of the relevant circumstances" and that "[w]ithout both sets of data, the court has nothing to compare and cannot determine whether a change has occurred"). A material and substantial change in circumstances may be established by direct or circumstantial evidence. *Arredondo*, 383 S.W.3d at 735. "[T]he law does not prescribe any particular method for a showing of changed circumstances, which may be established by circumstantial evidence." *In re A.L.E.*, 279 S.W.3d at 429.

To a modify a conservatorship order, the party seeking modification must also establish that the modification is in the best interest of the child. *See Epps*, 537

S.W.3d at 243. In determining the best interest of the child, courts consider the following non-exclusive factors:

(1)    the desires of the child;

(2)    the emotional and physical needs of the child now and in the future;

(3)    the emotional and physical danger to the child now and in the future;

(4)    the parental abilities of the individual seeking custody;

(5)    the programs available to assist the individual to promote the best interest of the child;

(6)    the plans for the child by the individual or by the agency seeking custody;

(7)    the stability of the home or proposed placement;

(8)    the acts or omissions of the parent, or potential conservator, that may indicate that the existing relationship is not a proper one; and

(9)    any excuse for the acts or omissions of the parent or potential conservator.

*Mauldin v. Clements*, 428 S.W.3d 247, 269 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). These factors are not exhaustive, and it is not a requirement that evidence on all factors be present in every case. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (stating, in context of termination of parental rights, that there is no requirement that all of *Holley* factors be proved as condition precedent for termination of rights); *In re A.L.H.*, 515 S.W.3d 60, 79 (Tex. App.—Houston [14th Dist.] 2017, pet. denied)

(stating, in context of modification case, that evidence is not required on every *Holley* factor to support modification).

## C.    *Analysis*

Mother argues that insufficient evidence supports the trial court's finding that a material and substantial change in circumstances had occurred justifying the modification of the December 2003 and April 2015 conservatorship orders. She argues that the record contains no evidence regarding the circumstances of the children, Lance, Ken, or Mother herself at the time the prior orders were entered and that there was "very limited evidence" of the circumstances of the children, their fathers, and Mother at the time of the modification. She contends that the evidence that the children were doing well in their placements with their respective fathers and that Mother had admitted to using marijuana several months before the modification hearing was insufficient to support the trial court's modification finding.

Although Mother is correct that DFPS elicited no testimony at trial concerning the circumstances of the children, their fathers, and Mother at the time of the December 2003 and the April 2015 orders appointing Mother as a joint managing conservator of Laura and Kevin, respectively, and giving her the exclusive right to determine the children's primary residence, we do not agree that the record contains

no evidence from which the trial court could have concluded that a material and substantial change in circumstances had occurred.

The record demonstrates that DFPS became involved with Mother and her children possibly as early as November 2015,[5] approximately seven months after the trial court entered the conservatorship order relating to Kevin, Mother's younger child. The family service plan, adopted by the trial court as an order of the court, set out the reason for DFPS involvement in the children's lives:

> On November 28th, the Texas Department of Family and Protective Services (hereinafter "CPS") received a report alleging Neglectful Supervision of unknown male child age 3. The referral stated that toddler child was found in the middle of the road. The child was not wearing any shoes, socks, or shirt. The child was found crying for his mother. The child's home was found, but the door was open. Grandmother was inside of the home and appeared to be inebriated. Mother was not inside of the home. The child was not given to the grandmother due to her condition. CPS assistance with the alleged victim is being requested at this time.

> On December 5th, 2016[, t]he Department of Family and Protective Services received a second referral alleging the Neglectful Supervision of 4 year old [Kevin] and 13 year old [Laura] by [Mother]. The referral stated that the 4 year old child is often times seen wandering the neighborhood unsupervised. The neighbors always have to take the child back home when he is found wandering. The police have also returned the child home after being found wandering around. The children are seen with dirty clothes and filthy in appearance.

---

[5] The first referral of Mother's family to DFPS, as stated in the family service plan, does not state a year for the referral, only the month and the day: November 28. In discussing that referral, the service plan references an "unknown male child age 3." Kevin, who was born in August 2012, would have been three years old in November 2015. The service plan then lists a second referral occurring on December 5, 2016, and specifically states that Kevin was four and Laura was 13 at the time of that referral.

There is drug use occurring in the home on a daily basis. There may also be alcohol use in the home. The adults in the home fight over the drugs and money. [Mother] is known to be violent. Law enforcement has been to the home due to the drugs. It is not known if the substances are being used around the children. There are always lots of people seen coming and going from the home.

No known gang activity or weapons in the home. Domestic violence in the home is unknown.

At trial, Benoit, the DFPS caseworker, did not testify concerning these referrals or how the children became involved with DFPS. Instead, she testified that the cases began "as participation in services" cases, which then "escalated" to conservatorship cases due to "some issues with compliance." In May 2017, DFPS sought modification of the December 2003 and April 2015 conservatorship orders or, in the alternative, termination of the parental rights of Mother, Lance, and Ken. The trial court ordered Mother, Ken, and Lance to complete a family service plan.

DFPS presented testimony that, during the pendency of the modification proceedings, Lance and Ken had completed their service plans, but Mother had not. At the time of the final hearing in August 2018, Laura had been living in Lance's home since March 2018, and Kevin had been living in Ken's home since June 2018. Mother had not provided Benoit with evidence that she had stable housing. DFPS also presented evidence of Mother's drug use, including positive test results for both marijuana and PCP usage, which Mother also admitted. Benoit testified that Mother had not completed a substance abuse treatment program, nor had she participated in

any of the random drug screenings that DFPS had requested during the pendency of the case. Benoit also testified that Mother failed to complete other requirements of her service plan, including failing to participate in parenting classes, participate in NA/AA meetings, complete anger management classes, and complete individual and family counseling.

A parent becoming an improper person to exercise custody can be a material and substantial change in circumstances justifying modification of a prior conservatorship order. *See In re A.L.E.*, 279 S.W.3d at 429. Courts have also concluded that a parent's drug use can support a trial court's finding of a material and substantial change. *See In re J.R.P.*, 526 S.W.3d at 779. Although no specific testimony at trial established the circumstances of the children and the parents at the time of the prior conservatorship orders, at the time of those orders in December 2003 and April 2015, the trial court appointed Mother as a joint managing conservator and gave her the exclusive right to determine her children's primary residence. There is no indication that DFPS was involved with the children at the time the trial court entered these orders. The record includes evidence that, after the entry of the April 2015 order relating to Kevin, DFPS became involved in the lives of Mother and the children after it received two referrals for neglectful supervision of the children. The record also includes evidence that DFPS sought modification of the conservatorship orders and, alternatively, termination of Mother's parental rights

based on Mother's conduct, that Mother tested positive for and admitted using controlled substances during the pendency of the case, and that Mother failed to complete most of the services required by the family service plan. We conclude that the trial court reasonably could have determined that Mother's circumstances had materially and substantially changed since the entry of the December 2003 and April 2015 conservatorship orders and that some evidence in the record supports this determination. *See* TEX. FAM. CODE ANN. § 156.101(a)(1); *Arredondo*, 383 S.W.3d at 735 (stating that material and substantial change in circumstances may be established by direct or circumstantial evidence); *In re A.L.E.*, 279 S.W.3d at 429 (noting that material and substantial change can be established by circumstantial evidence).

Mother also argues that DFPS failed to present sufficient evidence that the modification of the conservatorship orders was in the children's best interests. In arguing that the evidence was insufficient to support the best interest finding, Mother points out that DFPS failed to elicit testimony relevant to several of the *Holley* factors, including the children's desires, the children's emotional and physical needs, the availability of programs to assist an individual in promoting the children's best interest, the stability of the proposed placements, acts or omissions by a parent indicating the parent-child relationship was improper, and excuses for these acts or omissions.

As an initial matter, we note that the *Holley* factors are not exclusive, and the party seeking modification of the conservatorship orders need not present evidence on every factor in order to support a finding that modification is in the children's best interest. *See In re A.L.H.*, 515 S.W.3d at 79; *Mauldin*, 428 S.W.3d at 269. DFPS presented evidence that, after it became involved in the children's lives, Mother tested positive for using marijuana and PCP. Although Mother's family service plan required her to complete a substance abuse treatment program and she attended treatment with Career and Recovery, she was unsuccessfully discharged from that program and she did not participate in the drug tests that DFPS requested.

Benoit testified that the family service plan required Mother to participate in several other classes and programs, including parenting classes, NA/AA meetings, anger management classes, and individual and family counseling. She testified that Mother did not complete these requirements. Benoit also testified that both Ken and Lance completed the parenting classes required by their service plans, and Ken informed Benoit that, due to the classes, he felt as though he had improved as a parent. *See Mauldin*, 428 S.W.3d at 269 (listing *Holley* factors, including "parental abilities of the individual seeking custody" and "programs available to assist the individual to promote the best interest of the child").

DFPS presented evidence that Laura had been living with Lance and Lance's mother, Laura's grandmother, since March 2018 and that Kevin had been living with

26

Ken, Ken's partner, and their children since June 2018. Both Laura and Kevin were thriving in their placements with their fathers. Benoit testified that Kevin, in particular, was doing well at Ken's home and that Ken was meeting all of Kevin's emotional and physical needs. Ken had expressed to Benoit that he wanted Kevin to finish school and go to college, and Ken was aware that, when that time arrived, Kevin would be eligible for a tuition waiver. *See id.* (listing "plans for the child by the individual or by the agency seeking custody" as *Holley* factor). Benoit also testified that while both Lance's and Ken's homes were stable, Mother had not provided any information to Benoit regarding her living conditions. *See id.* (listing "stability of the home or proposed placement" as *Holley* factor). Mother also presented no evidence of her plans for either child.

The evidence presented at the modification hearing reflects that Mother undoubtedly loves her children and that the children love her. Neither Lance nor Ken wanted to keep the children away from Mother, and neither of them believed that the children were in any danger from Mother, but they both testified that they were not comfortable with Mother's visiting the children alone and they were not comfortable supervising Mother's visits with the children. Benoit echoed these concerns, testifying that the Department's primary concerns were Mother's sobriety and her mental health. Although Benoit did not elaborate in her testimony, she stated that Mother had made "threatening statements about the folks in this case." Mother,

during in her testimony, was extremely critical of both Benoit and DFPS, at one point stating, "So, she [Benoit] needs to watch the bad she doing with my kids. She needs to watch her kids, because what you do to somebody else comes back on you ten times."

Mother testified that she is employed, working both for a home delivery service and as a caregiver for the elderly. She stated that she can work as many or as few hours as she chooses, and she stated that she makes between $25 and $40 per hour. When asked by Ken's counsel if she could afford child support if the trial court modified the conservatorship orders and required the children to live with their fathers, Mother stated that she could not. Mother stated, "I can take care of my own kids," and she testified that she would not give Lance and Ken "a dime." When pressed by Ken's counsel, Mother testified that she would work "zero hours" and would intentionally not work rather than pay child support to Lance and Ken.

Considering all of the testimony presented at the modification hearing, DFPS presented evidence from which the trial court reasonably could have concluded that modifying the conservatorship orders to name Lance and Ken as sole managing conservators of Laura and Kevin, respectively, and to name Mother as possessory conservator of both children was in the children's best interest. *See* TEX. FAM. CODE ANN. § 156.101(a)(1); *Epps*, 537 S.W.3d at 243. We therefore conclude that the trial

court did not abuse its discretion in modifying the December 2003 and April 2015 conservatorship orders.

We overrule Mother's first issue.

**Appointment of Fathers as Sole Managing Conservators**

In her second issue, Mother argues that the trial court erred when it failed to appoint her as a joint managing conservator and instead appointed Lance and Ken as sole managing conservators over Laura and Kevin, respectively, and appointed her as possessory conservator. She argues that DFPS failed to overcome the presumption that she, as the children's biological mother, should be named a joint managing conservator.

## A. *Governing Law*

The best interest of the child is always the primary focus of conservatorship decisions. *Turrubiartes v. Olvera*, 539 S.W.3d 524, 528 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Texas law presumes that the appointment of the parents of a child as joint managing conservators is in the child's best interest. TEX. FAM. CODE ANN. § 153.131(a)–(b); *Turrubiartes*, 539 S.W.3d at 528. Specifically, Family Code section 153.131(a) provides:

> Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

TEX. FAM. CODE ANN. § 153.131(a). However, this presumption that appointment of both parents as joint managing conservators is in the child's best interest is rebuttable. *Id.* § 153.131(b). Once the party seeking appointment as sole managing conservator introduces evidence to rebut the presumption, it disappears. *Turrubiartes*, 539 S.W.3d at 528.

The Texas Supreme Court has held that the parental presumption set out in Family Code section 153.131(a) only applies in original custody proceedings and not in modification proceedings, such as the underlying case. *See In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000). In holding that the parental presumption does not apply in modification proceedings, the supreme court noted that, in enacting the presumption, the Legislature placed the presumption in Family Code Chapter 153, which governs original custody proceedings, and did not include the presumption in Family Code Chapter 156, which governs modification proceedings. *Id.* The court stated:

> Chapter 153 and Chapter 156 are distinct statutory schemes that involve different issues. Chapter 156 modification suits raise additional policy concerns such as stability for the child and the need to prevent constant litigation in child custody cases. The Legislature has determined that the standard and burden of proof are different in original and modification suits. A natural parent has the benefit of the parental presumption in an original proceeding, and the nonparent seeking conservatorship has a higher burden. However, the Legislature did not impose different burdens on parents and nonparents in modification suits. When we construe a statute, our primary objective is to give effect to the Legislature's intent. Because the Legislature did not express its

30

> intent to apply the presumption in Chapter 156 modification suits, courts should not apply the presumption in those cases.

*Id.* (internal citations omitted). The court thus concluded, "Chapter 153's parental presumption does not apply in a Chapter 156 modification proceeding." *Id.* at 344.

Following *In re V.L.K.*, the intermediate appellate courts, including this Court, have likewise held that the presumptions provided for in Family Code section 153.131 apply only in suits for an original custody determination under Chapter 153, not in modification proceedings under Chapter 156. *See, e.g.*, *Rolle v. Hardy*, 527 S.W.3d 405, 416 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("Section 153.131's parental presumption applies only in original custody disputes—it does not apply to modification suits, such as the one [the children's uncle] has filed here."); *Mauldin*, 428 S.W.3d at 266–67 (holding that parental presumption did not apply in case that started as modification proceeding filed by child's father and ultimately became dispute between child's mother and child's paternal grandparents, who intervened in case); *In re S.A.H.*, 420 S.W.3d 911, 917 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that Chapter 156 governing modifications "does not contain any provisions either expressly recognizing a parental presumption or providing methods to rebut such a presumption" and that section 156.101, setting out standard of proof for modification of conservatorship, "contains no express reference to a parental presumption"); *In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 78–79 (Tex. App.—San Antonio 2011, pet. denied) (holding, in case in which child's former

step-father sought conservatorship over child and termination of biological father's parental rights following death of child's mother, that suit was modification suit governed by Chapter 156 and parental presumption did not apply); *In re C.A.M.M.*, 243 S.W.3d 211, 216 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("By including the parental presumption in original suits affecting the parent-child relationship but not in suits for modification of conservatorship, the Legislature balanced the rights of the parent and the best interest of the child."); *In re P.D.M.*, 117 S.W.3d 453, 457–58 (Tex. App.—Fort Worth 2003, pet. denied) (stating, in custody dispute between children's father and children's grandmother following death of children's mother, that "the Legislature decided that based on policy concerns, such as stability for the child, once custody, even between two parents, is established by court order, the parental presumption does not apply to any subsequent custody proceeding regardless of the parties involved").

## B. *Analysis*

In these cases, the trial court first entered an order determining custody with respect to Laura in December 2003, when it adjudicated Lance as Laura's father, appointed Mother and Lance as joint managing conservators over Laura, named Mother as the conservator with the exclusive right to designate Laura's primary residence, set out a visitation and possession schedule for Lance, and imposed support obligations on Lance. The trial court first entered an order determining

custody with respect to Kevin in April 2015, when it adjudicated Ken as Kevin's father, appointed Mother and Ken as joint managing conservators over Kevin, gave Mother the exclusive right to designate Kevin's primary residence, set out Ken's visitation and possession schedule, and imposed support obligations on Ken.

In May 2017, DFPS moved to modify the December 2003 and April 2015 orders, ultimately seeking the appointment of Lance and Ken as the sole managing conservators over Laura and Kevin, respectively, and the appointment of Mother as a possessory conservator over the children. DFPS, Lance, and Ken also requested corresponding changes to the fathers' child support obligations and the imposition of a support obligation on Mother.

It is undisputed that the underlying cases are modification proceedings, not proceedings seeking an original child custody determination. As such, these cases are governed by Family Code Chapter 156, not Family Code Chapter 153. Because these cases are modification proceedings, the presumption set out in Family Code section 153.131—that the appointment of the parents of a child as joint managing conservators is in the best interest of the child—does not apply in these cases. *See In re V.L.K.*, 24 S.W.3d at 343–44; *Rolle*, 527 S.W.3d at 416; *Mauldin*, 428 S.W.3d at 266–67. Thus, to establish that modification was appropriate in this case, the Department only had to meet the requirements of Family Code section 156.101, which sets out the standard of proof for modifying a conservatorship order. *See* TEX.

FAM. CODE ANN. 156.101(a); *In re V.L.K.*, 24 S.W.3d at 343 (holding that, in modification proceedings in which parties request jury trial, trial court should instruct jury by tracking language of section 156.101 and should not apply presumption set out in section 153.131); *In re S.A.H.*, 420 S.W.3d at 917 (noting that section 156.101 "contains no express reference to a parental presumption"); *In re S.E.K.*, 294 S.W.3d 926, 928–29 (Tex. App.—Dallas 2009, pet. denied) (noting that supreme court concluded in *In re V.L.K.* that "the presumption in section 15[3].131(a) that a parent should be appointed as sole managing conservator or both parents as joint managing conservators did not apply in a modification proceeding under chapter 156"). We conclude that the trial court did not err by failing to apply section 153.131's presumption in this case to retain Mother as a joint managing conservator over the children.

We overrule Mother's second issue.

## Requirement of Supervised Visitation

Finally, in her third issue, Mother contends that the trial court abused its discretion in restricting her visitation with the children to supervised visitation because no evidence in the record supports this drastic restriction.

### A. *Governing Law*

The best interest of the child is always the primary consideration in determining issues relating to possession of and access to the child. TEX. FAM. CODE

ANN. § 153.002. The Family Code further provides that there is a rebuttable presumption that a standard possession order "provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator" and is in the best interest of the child. *Id.* § 153.252; *see id.* §§ 153.3101–.317 (setting out terms of standard possession order). In determining whether to depart from the standard possession order, the court may consider: (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as possessory conservator; and (3) any other relevant factor. *Id.* § 153.256; *In re A.D.*, 474 S.W.3d 715, 730–31 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The trial court has broad discretion in fashioning restrictions on a parent's possession and access that are in the best interest of the child. *In re H.D.C.*, 474 S.W.3d 758, 764 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *In re S.A.H.*, 420 S.W.3d at 928; *see In re A.G.*, 531 S.W.3d 329, 333 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A trial court, however, may place conditions on a parent's access, such as supervised visitation, when it is in the child's best interest."). However, the trial court abuses that broad discretion if it imposes restrictions on possession and access that exceed those required to protect the best interests of the child. *In re H.D.C.*, 474 S.W.3d at 764; *see* TEX. FAM. CODE ANN. § 153.193 ("The terms of an order that denies possession of a child to a parent or imposes restrictions

or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child."). The court does not abuse its discretion if evidence in the record supports a finding that the restriction is in the child's best interests. *In re H.D.C.*, 474 S.W.3d at 764; *Moreno v. Perez*, 363 S.W.3d 725, 738 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("When a court modifies terms and conditions of an access and possession order, the record must contain evidence in support of the terms of the modification—a bare recitation in the court's order that such modification is in the children's 'best interest' is not enough.").

### B. Analysis

At the close of the modification hearing, the trial court named Lance and Ken as Laura's and Kevin's sole managing conservators and named Mother as the children's possessory conservator. The trial court also ordered that Mother's possession of and visitation with the children be supervised by an adult mutually agreeable to Mother and the children's fathers, or, if the parties could not come to an agreement, through the Harris County Domestic Relations Office.

On appeal, Mother argues that the trial court abused its discretion by requiring that her visitation with the children be supervised. She argues that no evidence was presented that the children would be exposed to any risk of harm if her visitation with the children were unsupervised. She argues that Benoit's, Ken's, and Lance's

testimony that supervised visitation would be in the children's best interest was conclusory, as none of them provided a factual basis for why they believed supervised visitation was necessary. Mother also argues that DFPS presented no evidence concerning the nature and extent of her substance use and that her substance use alone should not justify requiring that her visitation be supervised. Mother points out that the evidence at trial was undisputed that she loved her children and that they loved her, that everyone involved in the case believed that Mother should continue to have contact with the children, and that both Ken and Lance testified that they had no fears that Mother would harm the children.

As discussed above, DFPS presented evidence that Mother had problems with substance abuse. She tested positive for PCP usage during the pendency of the case and her last drug test in May 2018 demonstrated that she tested positive for marijuana. Mother was unsuccessfully discharged from the Career and Recovery substance abuse treatment program in May 2018, DFPS had no knowledge of whether Mother had enrolled in a different substance abuse treatment program following her discharge, and she never participated in any of the drug tests requested by the Department. She also failed to participate in several of the classes and programs required by her family service plan, and she made "threatening statements about the folks in this case." Benoit testified that these were the main considerations why DFPS believed it was in the children's best interest for their visitation with

Mother to be supervised. In addition, Mother expressed a willingness to defy a court order requiring her to pay child support to Lance and Ken, testifying that she would stop working entirely rather than contribute any of her earnings to the children's fathers for the children's support if she no longer had primary custody over the children.

Although Benoit, Ken, and Lance all testified that they believed Mother loved her children, that the children loved Mother, and that Mother should continue to have contact with the children, DFPS also presented evidence demonstrating that Mother had failed to take advantage of the programs available to assist her in promoting the best interest of either child and evidence raising concerns over Mother's sobriety and stability. Based on this record, we conclude the trial court reasonably could have concluded that requiring Mother's visitation to be supervised, whether by a mutually-agreeable adult or by the Harris County Domestic Relations Office, was necessary to protect the children's best interests. *See In re H.D.C.*, 474 S.W.3d at 764 (stating that trial court abuses its discretion if it imposes restrictions on possession and access that exceed those required to protect children's best interests, but court does not abuse its discretion if evidence in record supports finding that restriction is in children's best interest). We therefore hold that the trial court did not abuse its discretion in requiring that Mother's visitation with the children be supervised.

We overrule Mother's third issue.

## Conclusion

We affirm the modification orders of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Justice Landau, concurring and dissenting.