

# NUMBER 13-21-00380-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE J.C.

## On Petition for Writ of Mandamus.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Hinojosa and Silva
Memorandum Opinion by Justice Hinojosa[1]**

On November 3, 2021, relator J.C. filed a petition for writ of mandamus seeking to

compel the trial court to set aside an order striking relator's petition in intervention in the

---

[1] *See* TEX. R. APP. P. 52.8(d) ("When denying relief, the court may hand down an opinion but is not required to do so. When granting relief, the court must hand down an opinion as in any other case."); *id.* R. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."); *id.* R. 47.4 (explaining the differences between opinions and memorandum opinions).

underlying suit regarding the parent-child relationship. [2] We conditionally grant the petition for writ of mandamus.

## I.    BACKGROUND

In the underlying case, the Department of Family and Protective Services (Department) filed a "First Amended Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" regarding minor children G.S. and A.S. The two children have the same father, A.M.S. (father), and different mothers. G.S.'s mother is A.O. (mother), and A.S.'s mother is J.S. (stepmother). Relator is the maternal grandmother to G.S. The Department sought to terminate the parental rights of all three parents as to both children.

Relator filed a "Petition in Intervention in Suit Affecting the Parent-Child Relationship" alleging that she was the maternal grandmother to G.S. She alleged that it was in the best interest of G.S. that she be appointed sole managing conservator, and that the "appointment of the parents as joint managing conservators would not be in the best interest of the children because the appointment would significantly impair the children's physical health or emotional development." Relator alleged that mother had "engaged in a history or pattern of child abuse and child neglect." Relator requested that the court "consider this conduct in appointing [relator] as sole managing conservator or the parties as joint managing conservators." Relator asserted that she had standing to

---

[2] This original proceeding arises from trial court cause number A-21-7013-FL, and the respondent is the Honorable Richard P. Bianchi. *See id.* R. 52.2. Given the nature of this case, we utilize initials to identify the minor and family members. *See id.* R. 9.8(b).

2

intervene as a result of her substantial past contact with the child.

Stepmother filed a "Motion to Strike the Petition in Intervention of [Relator] in Suit Affecting the Parent-Child Relationship." Stepmother agreed that mother was not appropriate to have a conservatorship over G.S., however, stepmother moved to strike relator's petition in intervention on grounds it would not be in the best interests of the child because relator: (1) has not had actual care, custody and control of G.S., or substantial past contact with G.S.; (2) has not made regular or consistent attempts to visit G.S.; (3) has not bonded with G.S.; (4) has not recently bonded with G.S.; (5) cannot provide a safe and stable home environment; (6) will not protect G.S. from father; and (7) will not follow the directives of the Department, as evidenced by her inability to have FaceTime calls due to the fact she was allowing restricted individuals to have access to the FaceTime calls. Finally, stepmother asserted that she, as the biological mother of A.S., was willing and able to make sure that all of G.S.'s needs were not only met but exceeded.

On June 23, 2021, the trial court held a hearing on the motion to strike. The trial court heard testimony from relator, father, stepmother, a representative of the Department, and various members of the family and friends. Mother did not testify because at the time, she was in jail because she had assaulted father. At the hearing, relator's counsel clarified that relator was only seeking to intervene as to G.S., not as to A.S., and asserted that she possessed standing to do so under § 102.004(b) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 102.004(b).

At the conclusion of the hearing, the trial court verbally granted stepmother's motion to strike, and that same day, signed a written order striking relator's petition in

3

intervention. This original proceeding ensued. By two issues, relator asserts: (1) the trial court abused its discretion by granting stepmother's motion to strike; and (2) the trial court abused its discretion by denying relator's right to intervene in the suit and be heard on her claim seeking rights of conservatorship, access to and possession of her grandson, minor child G.S.

This Court requested that the real parties in interest file responses to the petition for writ of mandamus and thereafter received responses from the Department and father. The Department argues that the statutory language in § 102.004, stating that the trial court "may" allow a grandparent to intervene, provides the trial court with the discretion to deny an intervention even though the intervenor meets the standing requirements of § 102.004(b). However, according to the Department, "[f]rom the record established at the hearing, it is undisputed that [relator] had substantial past contact" with G.S., and "[t]here is some evidence that being placed with [mother] and [father] would significantly impair G.S.'s physical health or emotional development." The Department concluded its response by stating that, "[h]aving outlined the relevant authority and provided this Court with the relevant facts, the Department will defer to this Honorable Court to determine whether to deny" the petition for writ of mandamus.

Father also filed a response to the petition for writ of mandamus. He asserted that he was in "agreement with the facts, law[,] and argument asserted by [relator]," and that he was filing a response to the petition in order to assert additional arguments in support of allowing relator to intervene.

4

## II. Mandamus

Mandamus is an extraordinary and discretionary remedy. *See In re Allstate Indem. Co.*, 622 S.W.3d 870, 883 (Tex. 2021) (orig. proceeding); *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 138 (Tex. 2004) (orig. proceeding). The relator must show that (1) the trial court abused its discretion, and (2) the relator lacks an adequate remedy by appeal. *In re USAA Gen. Indem. Co.*, 624 S.W.3d 782, 787 (Tex. 2021) (orig. proceeding); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 135–36; *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding). A trial court abuses its discretion when it acts with disregard for guiding rules or principles or when it acts in an arbitrary or unreasonable manner. *In re Garza*, 544 S.W.3d at 840. We determine the adequacy of an appellate remedy by balancing the benefits of mandamus review against the detriments. *In re Acad., Ltd.*, 625 S.W.3d 19, 25 (Tex. 2021) (orig. proceeding); *In re Essex Ins.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136.

Due to the unique and compelling circumstances presented in a suit affecting the parent-child relationship, mandamus relief is an appropriate remedy for an order denying or granting a motion to dismiss for lack of standing in such a case. *See In re Derzapf*, 219 S.W.3d 327, 335 (Tex. 2007) (orig. proceeding) (per curiam) (concluding that the exceptional circumstances presented by a challenge to temporary orders in a suit for access to children support the availability of mandamus review); *Geary v. Peavy*, 878 S.W.2d 602, 603 (Tex. 1994) (orig. proceeding) (per curiam) (stating that mandamus

5

review is appropriate when the trial court's jurisdiction is challenged in a proceeding involving child custody issues due to the unique and compelling circumstances presented in a custody dispute); *In re Shifflet*, 462 S.W.3d 528, 541–42 (Tex. App—Houston [1st Dist.] 2015, orig. proceeding) (concluding that there is no adequate remedy on appeal and mandamus is appropriate to seek relief from an order granting a motion to dismiss an intervention in a suit affecting the parent-child relationship for lack of standing); *see also In re Martin*, 523 S.W.3d 165, 169 (Tex. App.—Dallas 2017, orig. proceeding).

## III.    STANDARD OF REVIEW

"Standing, like other issues implicating a court's subject matter jurisdiction, is a question of law that we review de novo." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018); *see In re T.D.L.*, 621 S.W.3d 346, 350 (Tex. App.—San Antonio 2021, no pet.); *In re T.E.R.*, 603 S.W.3d 137, 141 (Tex. App.—Texarkana 2020, no pet.). When a plaintiff's standing to bring suit is governed by statute, we apply principles of statutory interpretation to determine whether the plaintiff has shown that she "falls within the category of persons upon whom such standing has been conferred." *In re H.S.*, 550 S.W.3d at 155; *see In re T.E.R.*, 603 S.W.3d at 141. "The plaintiff bears the burden to allege facts showing the trial court's jurisdiction, and we construe the pleadings liberally in the plaintiff's favor." *In re T.D.L.*, 621 S.W.3d at 350; *see In re A.D.T.*, 588 S.W.3d 312, 316 (Tex. App.—Amarillo 2019, no pet.) ("The party asserting standing bears the burden of proving that issue."); *see also In re Y.B.*, 300 S.W.3d 1, 4 (Tex. App.—San Antonio 2009, pet. denied).

## IV.    APPLICABLE LAW

In this case, relator filed a petition in intervention in a pending lawsuit. She alleges

6

that she possesses standing to do so based on a statutory provision in the family code governing intervention by a grandparent. *See* TEX. FAM. CODE ANN. § 102.004. The relevant section provides:

> An original suit requesting possessory conservatorship may not be filed by a grandparent or other person. However, the court may grant a grandparent or other person . . . deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this chapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

*Id.* § 102.004(b).[3] The phrase "substantial past contact" is not defined by statute or

---

[3] The Dallas and Beaumont courts of appeal have held that a grandparent seeking to establish standing under this provision need not show "substantial past contact" as would an "other person" under the statute. *See In re Nelke*, 573 S.W.3d 917, 922–23 (Tex. App.—Dallas 2019, orig. proceeding); *see also In re M.B.*, No. 09-19-00247-CV, 2019 WL 4865197, at *3 (Tex. App.—Beaumont Oct. 3, 2019, orig. proceeding) (mem. op.) (per curiam) ("Section 102.004 required Grandfather to establish only one thing to intervene into the Department's [suit affecting the parent-child relationship]—a decision appointing the sole living parent, Father, to be the children's managing conservator would significantly impair the children's physical health or emotional development."). In reaching this conclusion, the Dallas court reasoned as follows:

> Maternal Grandmother urges that Paternal Grandmother could not establish the first requirement for standing under [§] 102.004(b) because Paternal Grandmother did not allege in her petition that she had substantial past contact with the child, and the evidence at the hearing showed she had no contact with the child before filing the petition to intervene. Paternal Grandmother argues in her response the 'substantial past contact' requirement does not apply to a grandparent but instead applies only to 'other person.' We agree. If [§] 102.004(b) affords grandparents standing only if they have substantial past contact with their grandchild, then the word 'grandparent' in subsection (b) is rendered meaningless as 'grandparents' are inevitably persons themselves and their separate inclusion in the text would be pointless. We presume the Legislature intended the words it used to have effect. *See Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). Further, under the last-antecedent doctrine, which we use to aid in interpreting statutes, a qualifying phrase should be applied only to the words or phrase immediately preceding it to which it may be applied without impairing the meaning of the sentence. *Id.* at 580–81.

> Our conclusion is supported by more than just grammar. A grandparent is commonly and well understood to stand in a different relation to a child than members of the general public. *See, e.g.*, *Troxel v. Granville*, [530 U.S. 57, 64] (2000) (citing States' recognition of important role grandparents play in many cases, including that of parental nature); *Bos v. Smith*, 556 S.W.3d 293, 296 (Tex. 2018) ('Grandparents have a special role in the family

caselaw, and the inquiry into whether a party has had "substantial past contact" with a child is fact-intensive and focuses on the amount of actual contact. *See In re T.E.R.*, 603 S.W.3d at 142 (collecting cases).

This "grandparent-specific statute requires grandparents seeking to intervene in a pending suit to demonstrate that appointment of a parent as sole managing conservator would 'significantly impair the child's physical health or emotional development.'" *In re C.J.C.*, 603 S.W.3d 804, 816 (Tex. 2020) (quoting TEX. FAM. CODE ANN. § 102.004(b)). "This significant impairment language creates a strong presumption in favor of parental custody and imposes a heavy burden on a nonparent." *In re A.D.T.*, 588 S.W.3d at 317 (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 166–67 (Tex. 1990)). "[T]here must be evidence of specific and identifiable conduct by the parent that is likely to cause harm to the child's physical health or emotional development." *In re A.D.T.*, 588 S.W.3d at 317. "Because of the fact-intensive nature of reviewing custody issues, an appellate court must afford great deference to the factfinder on issues of credibility and demeanor because the child's and parent's behavior, experiences, and circumstances are conveyed through

---

unit and often serve as safety nets for their children and grandchildren. Lending a hand, a heart, and an ear can be especially important when loved ones are experiencing the trauma of divorce.') . . . . Further, the question of standing is just a first-level inquiry into who may be heard and not what is to be done. *See In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018) (reviewing a trial court's grant of plea to jurisdiction on grandparents' standing). Accordingly, we conclude the qualifying phrase 'substantial past contact' modifies the second term rather than both items in the list of persons with standing. *See In re C.J.N.-S.*, 540 S.W.3d 589, 592 (Tex. 2018) [per curiam] (applying last-antecedent test to family code [§] 154.303(a)(1)).

*In re Nelke*, 573 S.W.3d at 922–23. Here, the parties and trial court proceeded on the assumption that relator needed to show "substantial past contact." In this original proceeding, the parties have not provided briefing or argument regarding the *Nelke* determination. For purposes of this case, we assume without deciding that relator was required to show substantial past contact.

8

words, emotions, and facial expressions that are not reflected in the record." *Id.*

## V.     ANALYSIS

By two issues, relator asserts that the trial court abused its discretion by granting stepmother's motion to strike and by denying relator's right to intervene in the suit.

## A.     Discretion

We first address the appropriate standard of review. As stated previously, the Department contends that § 102.004 allows the trial court to grant a petition in intervention when the statutory requirements are met but does not require it to do so. According to the Department, the Legislature's use of the word "may" mandates this interpretation of the statute.

We review a trial court's ruling on a motion to strike a petition in intervention for abuse of discretion. *See Mendez v. Brewer*, 626 S.W.2d 498, 499 (Tex. 1982); *Spurck v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 217 (Tex. App.—Austin 2013, no pet.); *In re N.L.G.*, 238 S.W.3d 828, 829 (Tex. App.—Fort Worth 2007, no pet.) (per curiam); *In re J.P.*, 196 S.W.3d 434, 440 (Tex. App.—Dallas 2006, no pet.). "A trial court abuses its discretion when a decision is arbitrary, unreasonable, and without reference to guiding principles," and a trial court has "no discretion in determining what the law is or applying the law to the facts." *In re Allstate Indem. Co.*, 622 S.W.3d at 875–76 (citations omitted); *see Walker*, 827 S.W.2d at 840.

"While the permissive word 'may' imports the exercise of discretion, 'the court is not vested with unlimited discretion, and is required to exercise a sound and legal discretion within the limits created by the circumstances of a particular case.'" *Iliff v. Iliff*,

339 S.W.3d 74, 81 (Tex. 2011) (quoting *Womack v. Berry*, 291 S.W.2d 677, 683 (Tex. 1956) (orig. proceeding)); *see Pedernal Energy, LLC v. Bruington Eng'g, Ltd.*, 536 S.W.3d 487, 494 (Tex. 2017). We thus examine whether the trial court abused its discretion under the applicable statutory standard.

## B.    Evidence

We next examine whether relator has met her burden of proof to show standing under the statutory scheme. *See In re T.D.L.*, 621 S.W.3d at 350; *In re A.D.T.*, 588 S.W.3d at 316; *In re Y.B.*, 300 S.W.3d at 4. At the hearing, the trial court heard testimonial evidence from multiple parties.

### 1.    Relator

Relator testified that she is A.O.'s mother and G.S.'s grandmother. G.S. was born on January 4, 2012, and was approximately nine years old at the time of the hearing. Relator testified that mother and G.S. moved in with her at her home in Rockport, Texas, when G.S. was "about six months old." Relator testified that they moved in with her because she had "stopped in for a visit" at their home, and there "was a bad situation going on at the time." According to relator, mother "was in a severe state or episode of drug use or her mental condition [was] exasperated by drug use and [relator] packed them up right then" and moved them into her home. Mother and G.S. lived with relator until approximately the spring of 2014, when mother began working and obtained her own apartment, where she lived with G.S. and father.

Relator testified that mother and father "lived together for some time and there [were] continued problems between the two of them." At some point, father returned to

prison and mother began dating M.G. Mother and M.G. married in December of 2016 and shortly thereafter moved to Conroe. During this period, mother continued to have episodes of mental illness and relator attempted to have her seen by local mental health services.

In the fall of 2017, mother asked relator to come pick G.S. up because of "ongoing" incidents with police. At that time, G.S. had started pre-kindergarten. Relator stated that mother "was in the middle of an episode" and "in the middle of the fight," and she asked relator to, in mother's words, "come pick up the little bastard." Relator stated that she had previously made attempts to pick up G.S. "due to [mother and stepfather's] inconsistency with being able to care for him and fighting and police involvement." She testified that she contacted father, who was then out of prison, and notified him to ensure that "this time [she] got to bring [G.S.] home with [her]."

Relator testified that G.S. had "[p]retty much" lived with her since that time, but "[h]e did go back and forth between [me] and his dad and [stepmother]." After Hurricane Harvey, G.S. stayed with his father until relator reestablished a residence, "[b]ut he lived with [relator and husband] in our alternative living [space], our cabin, until we had our home fixed from the hurricane." Relator testified that she had actual care, custody, and control of G.S. during this period. She and father arranged for G.S. to attend school, and G.S. was enrolled from relator's address each year. Relator helped G.S. with his homework, and relator and father attended G.S.'s parent-teacher conferences. Relator testified that she took care of G.S. and cooked for him and made sure he had a healthy diet. She took care of his educational needs, medical needs, and emotional needs during

11

this time.

Relator testified that on September 19, 2017, father signed a form authorizing her to be a relative or voluntary caregiver for G.S. in recognition that she was his caregiver and could act as his parent.

In November of 2017, mother moved back to Rockport, but did not move in with relator, and G.S. remained in relator's care. "He would go for visits with his mom[,] but he did not go to live with her." Thus, relator continued taking care of G.S. After the pandemic began, relator homeschooled G.S. from March until October of 2020.

In October 2020, relator went on vacation for approximately three weeks, and G.S. lived with his father and stepmother during that period. Afterward, G.S. "stayed over there by choice so that [relator] could spend some time, not only finishing up some remodeling issues but so that [she] could deal with his mom's health issues." Relator testified that she was trying to obtain medical care for mother, and "in December we tried to have an involuntary committal." At this time, mother was not living with relator; however, relator discovered that mother was living in an abandoned home in Ingleside, and she "could not stand for that," so she picked mother up and "brought her home" on condition that mother obtain assistance with local mental health services. Relator testified that mother did so, and was receiving treatment three days each week, with medication, until the pandemic began. At that point, however, mother stopped taking her medication and "was no longer being seen." Relator testified that "[t]hings kind of went downhill from there." Relator stated that "it was not conducive for G.S. or us to live peacefully" together at that point, and so she moved mother into one of relator's rental properties. According to relator:

12

My daughter needs help. [G.S.] wants his mom to get help. He wants his mom back. It's just been impossible. I have tried every avenue that I know from her doctors to police intervention. At some point, even [father] helped to try to get an involuntary committal case brought before the court in December. But that went nowhere either[,] because she is an adult.

Relator testified that on the Saturday before the hearing, mother's husband M.G. had knocked on her door with "blood coming off his face and glass smashed on his face," and they called the police, who eventually arrested mother for assault.

Relator testified that she had a "very close" relationship with G.S., and it would be appropriate for him to be placed with her. She acknowledged she had a "good home" for G.S., with three bedrooms, where she lived with her husband, N.M., to whom she had been married since 2012. Relator testified that N.M. was looking forward to having G.S. live with them because they had a "very good relationship," and G.S. was her husband's "fishing buddy." Relator confirmed that she was asking the court to find that she had substantial past contact with G.S., allow her to intervene in the suit, and to place G.S. with her as an alternative to foster care. Relator stated that she "raised him," and he had "been in [her] home since he was young[,] and this is where he wants to be." She testified that she would follow the orders of the trial court regarding G.S.

Relator acknowledged that Texas Child Protective Services (C.P.S.) had concerns about a potential placement with her because approximately twenty-two years earlier, she was arrested for possession of drugs. She attended a Drug Court program, went to counseling, and successfully completed the program, after which her criminal case was dismissed. She testified that she does not use drugs or have any substance abuse problems. Relator further acknowledged that she had offered to have a home study

13

conducted, however, the Department told her that she was not eligible to have G.S. placed with her because she also "had a . . .history with C.P.S." Relator acknowledged that in 2002 and 2004, C.P.S. found "reason to believe" that she had provided neglectful supervision for her children. She was unaware that in 2003, C.P.S. found "reason to believe" that she had committed physical abuse, or that in 2006, C.P.S. found "reason to believe" that she had provided neglectful supervision. However, relator testified that all these events occurred prior to her successful completion of the Drug Court program. Relator further testified that the Department told her that it would not allow her to have visitation with G.S. because relator's husband and son interacted with G.S. during a FaceTime visit, but she testified that she allowed them to speak with G.S. because she "was only told that [G.S.] was not to have interaction with the parents." Relator testified that she did not intend to separate G.S. from his brother A.S., but she did not want G.S. to continue in foster care because she could not have visitation or contact with him.

Relator testified that father was currently renting a place on the property that she owned on her block. She further stated that mother was currently incarcerated, but if she were to get out of jail, she would also live in the property "down the road." During relator's examination, the Department expressed concern that G.S. was not supposed to have contact with either father or mother, and that relator did not follow the Department's rules during her FaceTime visits with G.S.

2.      **Father**

Father testified that he did not disagree with relator's testimony, and even when G.S. was living with him, he ensured that relator and G.S. saw each other every day.

14

Father testified that relator, stepmother, and he took "very good" care of G.S. He acknowledged that relator had been a "part of it all" for G.S. "the majority of the time" that he had been alive. Father agreed that it was traumatic for G.S. not to see relator, and G.S. would "throw fits" when he did not get to see her. He testified that it was in G.S.'s best interests to have access to relator.

Father testified that, at the time of the hearing, he was going through a divorce with stepmother, so there would eventually be a separation between G.S. and A.S., but it did not have to be permanent, and they could still "interact as brothers do." He, like relator, testified that he would follow court orders regarding G.S.

Father acknowledged he was living two properties away from relator in a rental property at "Lot C," and when mother is there, she stays at that property in "Lot A." Father testified that he did not allow G.S. to "see his mother unsupervised because she is unable." According to father, the rental property is approximately a block away from relator's home. He testified that mother does not go "at all" to relator's house, and he rarely does so. Father testified that he had been taking classes, undergoing drug testing, and otherwise complying with the Department's requirements. Father acknowledged signing the authorization agreement allowing relator to be a caregiver for G.S. He did so because "[mother] was getting so unstable [he] was going to pull her rights or get in [the] process of taking her custody rights away," and he "wanted [G.S.] to still have [relator] in his life."

### 3. J.S.C.

J.S.C. testified that he is relator's brother, and they speak every two to three days.

15

He confirmed that relator had "substantial contact" with G.S. J.S.C. visits relator frequently, and he believes her home is adequate to raise a nine-year-old. J.S.C. described relator's parenting skills as "very caring" and stated that he occasionally leaves his kids with her "for a little bit" when he visits her, and she "is very good with them." He testified that relator has a close bond with G.S., that he believed it would be difficult or traumatic for G.S. to be kept from her, and it was in G.S.'s best interest that he be placed with her. J.C.S. did not find relator's history with C.P.S. concerning. To his knowledge, relator did not break the Department's rules, and it was his brother and relator's husband who spoke with G.S. on FaceTime. He testified that relator would be protective of G.S. and that she would be able to follow court orders in order to have him returned to her.

### 4. J.L.D.

J.L.D. testified that she has been a friend of relator for twenty to twenty-five years. She keeps in close contact with her and tries to "go back and visit" every couple of years. She visited last June, and relator was then acting as a parent to G.S., as she had for "[m]ost of his life." She described their relationship as "amazing" and patterns her own relationship with her grandson on it. J.L.D. testified that relator and G.S. had "substantial contact" with each other and it would "devastate" G.S. to be deprived of that relationship. She stated that relator is an "amazing" grandmother and that she has an adequate home for him that is "minutes" from the beach. J.L.D. was aware of the previous issues that relator had with C.P.S. but testified that relator has been "clean and sober" since that time. J.L.D. testified that mother's mental health situation "breaks [J.L.D.'s] heart."

16

### 5. L.R.M.

L.R.M. testified that she knows relator because relator's son and L.R.M.'s daughter have a child together, so they share a "beautiful grandbaby." L.R.M. testified that she has known relator since the early summer of 2016. They have a close relationship. She has been to relator's home and observed G.S. interacting with relator, and they have an "awesome" relationship. According to L.R.M., G.S. was at relator's house "quite often" and "quite a bit," and the house was suitable for a child. To her knowledge, relator is clean and sober and serves as a good parent figure. According to L.R.M., it would be traumatic for G.S. to be denied access to relator, and it would be in G.S.'s best interest to be placed with her.

### 6. M.C.

M.C. testified that relator is her son M.G.'s mother-in-law. M.C. lives in Montgomery, Texas, and she has known relator for approximately ten years. She heard relator testify and she did not disagree with anything she said. She affirmed that relator and G.S. had a "warm," close relationship and spent a substantial amount of time together. According to M.C., there was "nowhere" that G.S. would rather be than with relator. According to M.C., relator picked G.S. up after school every day and they called her so G.S. "could talk to grandma [M.C.]" M.C. testified that it would be in G.S.'s best interest to return to relator, and relator could provide a "good stable home" for him.

### 7. Stephanie Ortega

Stephanie Ortega testified on behalf of the Department. She testified that she screened relator to determine if G.S. could be placed with her but could not proceed

17

further because of relator's C.P.S. history. Ortega testified that relator's C.P.S. history precluded her from serving as a proper placement for G.S. Further, based on her experience, the Department would have additional concerns about placing G.S. with relator because of "the location of both parents." According to Ortega, the rental property where father and mother live is "not a block away" from relator's home, "[i]t's on the same property," and she "can actually see [the rental property] in line of sight." According to Ortega, the mother and father are living mere "feet" from relator's home.

Ortega testified that she told relator that FaceTime visits were limited to those between relator and G.S., and "[n]o one else is approved and no one else is allowed" to participate. According to Ortega, the children's foster mother informed her that relator did not follow that rule. Ortega testified that she verbally informed relator regarding this limitation, though she did not provide written instructions, and she believed that relator violated this instruction on two separate occasions. Ortega testified that this was a "huge concern" for the Department. She further asserted that relator's C.P.S. history was "significant" and involved "very concerning" allegations but conceded that those incidents were "from [twenty-five] years ago." Based upon the FaceTime incidents, she believed that relator would openly defy court orders pertaining to G.S. Ortega testified that the Department had "different permanency goals" for G.S. and A.S., so they would eventually be separated.

### 8. Stepmother

Stepmother testified that she filed a motion to strike relator's petition in intervention because she "just [doesn't] think that's a good place for [G.S.]." Stepmother first met G.S.

between April and July of 2017. She believed that father had custody of G.S. and that G.S. was five years old at that time. Stepmother testified that both father and relator spent a lot of time with G.S. Stepmother and father began to live together right before Hurricane Harvey hit. She could not recall where G.S. was living at that time: "I want to say he was living with me . . . and [father] but I don't 100 percent remember."

Stepmother stated that she has seen the September 19, 2017 authorization giving relator authority to act as a caregiver for G.S. At that time, stepmother believed that G.S. was living with her and father in Rockport and they were taking him to school. Stepmother testified that she did not enroll G.S. in school, and as far as she was aware, father enrolled him in Portland as the "closest open school." She acknowledged that father might not have enrolled G.S. in school because father could not find his I.D., and stepmother explained that an I.D. is required to enroll a child in school. According to stepmother, G.S. spent weekends, sleepovers, and "maybe" spring break with relator, but "for the most part," G.S. lived with stepmother and father. Stepmother testified that this was the case from 2017 until May 2020, when she and father separated "for a little bit" until August or September of that year. During that period, G.S. stayed with relator. According to stepmother, when G.S. returned in August, he had gained "about [thirty] pounds and . . . his attitude was crummy." Stepmother explained that "at grandma's he gets treated like a grandson and waited on hand and foot and virtually got whatever he wanted." Stepmother testified that G.S. "[a]bsolutely" enjoyed time at relator's home and that he "loves his grandma very much." Stepmother acknowledged that G.S. "wants to be [with relator] and that's great," however, "he needs to be somewhere where there are

19

schedules and rules and not somewhere where [G.S.] just gets to run the house." She agreed that she believed that relator's house was unstable or chaotic because she "was there a few times in the four years" that she was with father, and "nothing was ever calm there." It "was always very chaotic, always someone coming in or out or something going on." She conceded that she only spent the total time of thirty to sixty minutes at relator's house over the course of the four years, and that period formed the basis for her opinions.

Stepmother testified that in her opinion, relator is not stable enough to provide a home for G.S. She testified that relator did not provide the "best" place for G.S., and that "there are a lot [of] better places for [him] to be." According to stepmother, G.S. "needs somewhere stable where people can't just pop in and see him whenever they feel is necessary." She further shared the Department's concerns that relator would not follow the Department's rules because such behavior was "consistent" for relator. Nevertheless, stepmother could not say "100 percent for sure" that placing G.S. with relator would "hinder" him.

On cross-examination, stepmother testified that she was trying to have her son, A.S., placed with her, but not G.S. When asked if she would prefer for G.S. to remain in foster care, she replied that she "prefer[red G.S.] to be somewhere where he will be best taken care of and his needs will not be met in a home with grandma." Stepmother acknowledged that her testimony conflicted with that provided by relator and father regarding relator's care of G.S. in 2020. She further acknowledged that she disagreed with their testimony that relator homeschooled G.S. from March until October of that year. According to stepmother, from March until late April "we did not have any schooling

20

because nobody had any idea on how to do virtual because it was a new thing."

Stepmother ultimately testified that if she was not taking care of G.S., then relator was doing so because father was not his primary caregiver. Stepmother testified that she separated from father on May 8, 2021, when she kicked him out of the house. She has filed for divorce, and the divorce proceedings are ongoing and include contested issues including custody. Stepmother acknowledged that C.P.S. removed her son A.S. from her custody on February 7, and he was living with L.A., a foster parent. She did not believe that there was any basis for his removal.

### 9. L.A.

L.A. testified that she is the boys' foster mother. She has been "very" good friends with stepmother for a long time, and they first met when she was four years old. She testified that the "boys are my family." L.A. testified that during relator's first FaceTime visit with G.S., relator allowed her husband to talk to G.S. L.A. testified that relator had asked her if that was allowed, and L.A. did not know at that time whether it was prohibited. After that initial FaceTime visit, L.A. contacted Ortega, who told her that the FaceTime conversations were limited to relator only and that no other parties could participate. During a subsequent FaceTime visit between relator and G.S., L.A. stepped away from the conversation briefly, and when she returned, G.S. was talking to a man that L.A. assumed was relator's son. L.A. testified that she cut the conversation short and reminded relator that other individuals were not allowed to participate. L.A. testified that shortly thereafter, she received a text message from relator that it was "not a big deal" and she should just "brush it under the rug" and "make the best decision for the boys." Based on

that incident, L.A. does not believe relator is an appropriate caretaker for G.S., and that relator would allow mother and father to remain in contact with G.S. In short, she has concerns that relator would not follow court orders. She has no other concerns about relator. L.A. testified that she would not want to coordinate care with relator in the future because relator has "worn out her welcome" and overstepped appropriate boundaries with overly persistent text messages.

On cross-examination, L.A. conceded that G.S. "absolutely" has a very close relationship with relator and he misses her. She testified that it has been difficult for him not to see her and possibly traumatic. L.A. testified that she wishes to keep G.S. for "the time being until a permanent home is found for him," but she stated that she was "not a permanent placement for him," and she has not considered adopting him.

## C. Summary

Based on the foregoing testimony, we conclude that relator met her burden to show that she had substantial past contact with G.S. and that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair G.S.'s physical health or emotional development. *See* TEX. FAM. CODE ANN. § 102.004(b). All the witnesses who testified regarding relator's interaction with G.S. confirmed that relator had substantial contact with G.S. and that she had engaged in such interaction with him since approximately six months after his birth. *See In re T.E.R.*, 603 S.W.3d at 142; *Mauldin v. Clements*, 428 S.W.3d 247, 262–66 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *In re N.L.G.*, 238 S.W.3d 828, 830–31 (Tex. App.—Fort Worth 2007, no pet.). The witnesses further testified that mother's significant mental health issues and

22

drug use rendered her "unable" to care for G.S. We note that the record indicates that mother's situation involved drugs, violence, frequent police interventions, and unstable living circumstances. These matters constitute specific and identifiable conduct by mother that is likely to cause harm to G.S.'s physical health or emotional development. *See In re A.D.T.*, 588 S.W.3d at 317. Accordingly, we conclude that the trial court abused its discretion by granting stepmother's motion to strike and striking relator's petition for intervention. Due to the unique and compelling circumstances presented here, we likewise conclude that relator lacks an adequate remedy by appeal. *See In re Derzapf*, 219 S.W.3d at 335; *Geary*, 878 S.W.2d at 603; *In re Shifflet*, 462 S.W.3d at 541–42. We sustain both issues raised by relator in this original proceeding.

## VI. CONCLUSION

The Court, having examined and fully considered the petition for writ of mandamus, the responses, and the applicable law, is of the opinion that relator has met her burden to obtain mandamus relief. In so ruling, we note that whether relator will ultimately succeed on the merits is a different question than whether she has the right simply to intervene, and the merits of relator's claims—that is, whether she should be appointed as G.S.'s sole managing conservator—are not before us in this original proceeding. *See In re H.S.*, 550 S.W.3d at 155.

We lift the stay previously imposed in this case. *See* TEX. R. APP. P. 52.10 ("Unless vacated or modified, an order granting temporary relief is effective until the case is finally decided."). We conditionally grant the petition for writ of mandamus and direct the trial court to withdraw its order of June 23, 2021, striking relator's petition for intervention, and

23

to enter an appropriate order denying the motion to strike and granting relator the right to intervene. We are confident the trial court will comply, and our writ will issue only if it does not.

LETICIA HINOJOSA
Justice

Delivered and filed on the
25th day of February, 2022.